# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EDWARD BISSAU MENDY** | * **CIVIL ACTION** |
| **BRENDON DENES,** | * |
| **IVANA HABAZIN, AND** | * |
| **CHARLES MUNIZ, AS MANAGER OF** | * **CASE NO:** 1:22-CV-535 |
| **IVANA HABAZIN** | * |
| **Plaintiffs** | * |
| versus | * **SECTION: " "** |
| | * |
| **BOXREC** | * |
| **JOHN SHEPPARD** | * **MAGISTRATE: " "** |
| **MARINA SHEPPARD** | * |
| **SAMSON LU** | * |
| **ASSOCIATION OF BOXING COMMISSIONS** | * |
| **ROUND 10 BOXING** | * |
| **DUBAI BOXING COMMISSION** | * |
| **AHMED SEDDIQI** | * |
| **JOSE MOHAN** | * |
| **MTK GLOBAL** | * |
| **DANIEL KINAHAN** | * |
| **Does 1 through 20** | * |
| **Defendants** | * |
| | * |

FILED
HARRISBURG, PA

APR 1 2 2022

PER _____
DEPUTY CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT, PETITION FOR INJUNCTIVE RELIEF AND DAMAGES

NOW INTO COURT, and in proper person, come Plaintiffs, Edward Bissau Mendy,

Brendon Denes, Ivana Habazin and Charles Muniz, all appearing *pro se*, who bring this Complaint,

Petition for Injunctive Relief and for Damages against BoxRec, BoxRec Officers, Owners and

Managers John Sheppard and Marina Sheppard, BoxRec Employee and Agent Sam Lu, the

Association of Boxing Commissions, Round 10 Boxing, Dubai Boxing Commission, Round 10

Boxing and Dubai Boxing Commission Officer, Owner and Manager Ahmed Seddiqi, Round 10

Boxing and Dubai Boxing Commission Manager and Employee Jose Mohan, MTK Global, MTK

Global Sponsor, Consultant and Controller Daniel Kinahan, and those unnamed defendants acting

in concert with and/or conspiring with them and listed herein as Does 1 through 20 (hereinafter also collectively referred to as the "Defendants" whether one or more).

In furtherance of their action, Plaintiffs respectfully aver as follows:

## **INTRODUCTION**

1. Plaintiffs bring this complex civil action as individuals, and primarily bring this action under Section 2 of the Sherman Act, 15 U.S.C. § 2, to restrain the Association of Boxing Commission and BoxRec from unlawfully maintaining monopolies in the markets for Boxing, the operation of an official boxing registry, the listing of fights, the recording of fights results, recording of results, rating of fighters, recording of fighter suspensions and other disciplinary actions, recording of boxing events, maintaining as database of fighters, fighter IDs, managers, promoters and other data using to the Boxing Industry and boxing professionals, through anticompetitive and exclusionary practices in violation of the Professional Boxing Safety Act (hereinafter also referred to as the "Boxing Act"), as Amended by the Muhammad Ali Boxing Reform Act (hereinafter also referred to as the Muhammad Ali Act), 18 U.S.C. 6301 *et seq.,* and to remedy the effects of this conduct.

2. Antitrust Defendant the Association of Boxing Commissions (ABC) is a North American not-for-profit organization that oversees the organization of professional boxing and mixed martial arts (MMA) contests and record-keeping as authorized under the Boxing Act and the Muhammad Ali Act (collectively, hereinafter also referred to as the "Boxing Acts). ABC is governed by delegates of state, provincial, and tribal athletic commissions in the United States and Canada.  Since its formation in 1990s, the ABC has since expanded to include international members even though it remains

an association of boxing commissioners organized and existing under the laws of the United States. The ABC engages in, and its activities substantially affect, interstate trade and commerce. The ABC engages in a range of activities and provides a range of products and services that are marketed, distributed, and offered to consumers (boxing commissions, fighters, managers, promoters, and other boxing professionals) throughout the United States, in this District, across state lines, and internationally.

3. Antitrust Defendant BoxRec, ltd. Is an incorporated or unincorporated entity founded in the United Kingdom. On belief and information, Defendant BoxRec is organized and existing under the laws of the State of United Kingdom as a limited company, and is headquartered in Doncaster, England. On belief and information, BoxRec is a for-profit entity owned and/or controlled by John Sheppard and his Wife Marina Sheppard. BoxRec was selected by the ABC to provide record keeping services as Boxing Register under the Muhammad Ali Act and does so throughout the United States. BoxRec also engages in, and its activities substantially affect, interstate trade and commerce. BoxRec provides a range of products and services that are marketed, distributed, and offered to the public and consumers throughout the United States, across state lines, and internationally, including but not limited to listing of fights, recording of results, rating of fighters, recording of fighter suspensions and other disciplinary actions, recording of boxing events, maintaining as database of fighters, fighter IDs, managers, promoters and other data using to the Boxing Industry and boxing professionals.

4. On belief and information, in 2016 Defendant Association of Boxing Commissions selected BoxRec as the sole Boxing Register empowered to perform recordkeeping

under the Boxing Act and Muhammad Ali Act, to the exclusion of Fight Fax, the extant incumbent, and all others, creating a monopoly in violation of the Sherman Act.

5.  Plaintiffs primarily bring this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendant violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

6.  Plaintiffs also bring this action on their own behalf as citizens, for their general welfare, and under their statutory, equitable, or common law powers, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.  Further, this action is brought under the Sherman Act Antitrust Defendants ABC and BoxRec have conspired with each other and with others to not only maintain a monopoly but also because this monopoly and monopoly actions have caused the Plaintiffs harm.

8.  Commencing in March 2021 or thereabouts on belief and information, and continuing to the present, various employees and/or agents of the ABC, BoxRec, BoxRec Officers, Owners and Managers John Sheppard and Marina Sheppard, BoxRec Employee and Agent Sam Lu, the Association of Boxing Commissions, Round 10 Boxing, Dubai Boxing Commission, Round 10 Boxing and Dubai Boxing Commission Officer, Owner and Manager Ahmed Seddiqi, Round 10 Boxing and Dubai Boxing Commission Manager and Employee Jose Mohan, MTK Global, MTK Global Sponsor, Consultant and Controller Daniel Kinahan, and those unnamed defendants acting in concert with and/or conspiring with them entered into a conspiracy to prevent the listing of the Event organized by Plaintiff Mendy, held on April 10, 2021 at the Arabian Ranches Golf Club

in Dubai, United Arab Emirates and which had the other Plaintiffs as participants. Thus, purpose of the conspiracy was to suppress the publication of the results the Event, to suppress the publication of the results of all other events that Plaintiff Mendy was promoter or otherwise associated, as well as to intimidate and otherwise suppress the rise of Mendy and his boxing promotion business, all in violation of the Boxing Act and Muhamed Ali Act, the Sherman Act and the Racketeering and Corrupt Organizations Act (RICO).

9.  As result, this complex civil action also is brought for Violation of the Boxing Acts as well as for RICO remedies authorized by the federal statutes at <u>18 U.S.C. 1961</u> *et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable Superior Court deems just and proper under all circumstances which have occasioned this Initial COMPLAINT.  See 18 U.S.C. §§ <u>1964</u>(a) and (c) ("Civil RICO").

10. The primary basis of the RICO part of the Complaint is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines and internationally, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years.

11. A secondary basis for the RICO part of the Complaint is the perversion of the ABC and its use and operation as criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines.

12. The predicate acts alleged here cluster around the violation of the Boxing Act, as amended by the Muhammad Ali Act, Violation of the Sherman Antitrust Act by operating a monopoly in Boxing, and Violation of the RICO Act by the conversion of

funds, criminal intimidation, extortion, robbery, assault and battery, and Money
Laundering.

13. Other RICO predicate acts, although *appearing* to be isolated events, were actually part
of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.,* mail
fraud and bank fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

14. An objective of the racketeering *enterprise* has been to inflict severe and sustained
economic hardship upon Plaintiffs, with the intent of impairing, obstructing, preventing
and discouraging Plaintiff Mendy from promoting boxing events and promoting
fighters; Plaintiff Muniz from advancing and other managing his fighters, including
Ivana Habazin; and the Fighter Plaintiffs (Brendon Denes and Ivana Habazin) from
plying their trade as professional boxers and/or being rated to have a shot at title fights.

15. Additionally, this action arises out of Defendants BoxRec's and ABC's violations of the
Civil Rights of Plaintiffs Mendy and Denes, both overt and structural racism.

16. Further, this action arises from various ancillary state actions and pendent claims
including claims for Libel and Slander, Unfair Trade Practices, and various other state
claims, all as outlined herein below.

## **JURISDICTION**

17. Jurisdiction of this Court arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction),
and pursuant to 28 U.S.C. § 1367 (Supplemental Jurisdiction) for pendent state law
claims.

18. This Court has subject matter jurisdiction over this action under Section 4 of the
Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

19. This honorable Court also has original jurisdiction pursuant to the civil RICO remedies at <u>18 U.S.C. 1964</u>.

20. Further, Jurisdiction of the subject matter further is proper pursuant to the Civil Rights Act of 1964 as amended, the Civil Rights Act of 1991, 42 U.S.C. Section 2000e et seq., and the Civil Rights Act of 1866, and possibly under 42 U.S.C. Section 1983 for violation of Plaintiffs Civil Rights under color of state authority and law.

21. The Court has personal jurisdiction over the Defendants, including both Antitrust Defendants BoxRec and the ABC as well as MTK Global, Kinahan and the other defendant, directly or based on their participation in the conspiracy.

22. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because both BoxRec and the ABC transact business in this District and are found within this District.

23. Venue is proper in this Court because the acts complained of herein occurred in part within this District and because BoxRec, the ABC and MTK Global transact business in this District and can be found within this District. Thus, this District is an appropriate venue.

24. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because substantial part of the events or omissions giving rise to part of the claims occurred in this district. Defendants ABC, MTK, and Kinahan do substantial business in this judicial district, has substantial minimum contacts with this judicial district, and/or intentionally availed itself of the benefits and protections of the law through the promotion, sale, marketing, and provision of services in Pennsylvania; See 18 U.S.C. § 1965 ("Any civil action or proceeding under this chapter against any person may be

instituted in the district court of the United States for any district in which such person

resides, is found, has an agent, or transacts his affairs.").

25. Further, Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

Defendants ABC, MTK and Kinahan are subject to personal jurisdiction in this judicial

district and ABC resides in this district.

**PARTIES**

26. Plaintiffs herein (hereinafter also collectively referred to as "Plaintiffs") are:

    a.  EDWARD BISSAU MENDY (hereinafter also referred to "Mendy"), a natural

person of the full age of majority, and having his principal place of residence in

the town of Kinnelon, New Jersey and the manager and owner of Lion Heart

Boxing Productions (including both the incorporated and unincorporated entities).

Plaintiff Mendy is a promoter doing business in multiple jurisdictions and has

promoted boxing events in several states that have boxing commissions that are

members of the Defendant ABC. At all times relevant, Mendy served as official

promoter for various Lion Heart Boxing Productions entities and/or did business

as Lion Heart Boxing Productions (hereinafter also referred to "LHBP").

    b.  BRENDON DENES (hereinafter also referred to "Denes"), a natural person of

the full age of majority, and having his principal place of residence in

Masvingo, State of Zimbabwe and a professional boxer that participated as a

fighter in a bout that was part of the event organized by Plaintiff Edward Bissau

Mendy on April 10, 2021 at the Arabian Ranches Golf Club in Dubai, UAE

(hereinafter also referred to as the "Event") that Defendants BoxRec, the ABC,

Round 10, MTK, the Individual Defendants (Kinahan, Seddiqi, Mohan, Lu,

Sheppard and M.Sheppard) and various unknown persons and co-conspirators of Defendants (Does 1 through 20) conspired to suppress. Denes also participated in an event on December 11, 2021 that the BoxRec Defendants (BoxRec, Lu, Sheppard and M.Sheppard) also refused to record and on belief and information conspired to suppress. At all times relevant, Denes was a professional boxer who makes his living from boxing and relies on his professional record to maximize his fight bookings and earnings. He was listed inactive for the better part of the last year is currently listed inactive despite three fights in the last year as a result of the BoxRec Defendants' refusal to register the results of his fights.

c.   IVANA HABAZIN (hereinafter also referred to "Habazin"), a natural person of the full age of majority, a citizen of Croatia and having his principal place of residence in the State of Florida. At all times relevant, Habazin was a professional boxer who making a living from boxing and relies on her professional record to maximize her fight bookings and earnings. Habazin is a European fighter from Croatia and not only participated as a fighter in a bout that was part of the event organized by Plaintiff Edward Bissau Mendy on April 10, 2021 at the Arabian Ranches Golf Club in Dubai, UAE but also fought for the inaugural WBC Middleweight title on the Event. She currently is listed inactive despite her April 10, 2021 win.

d.   CHARLES MUNIZ (hereinafter also referred to "Muniz"), a natural person of the full age of majority, and having his principal place of residence in Miami, State of Florida, and the Manager of Habazin. At all times relevant, Muniz was

and is a professional boxing manager and consultant who makes a living in booking and managing fighters, including Habazin, and relies on the documented professional records of his fighter to maximize their fight bookings and earnings.

27. Made Defendants herein (hereinafter also collectively referred to as "Defendants") are the following:

a. BOXREC, LTD, also known as BoxRec.com or simply as BoxRec (hereinafter also referred to "BoxRec"), on information and belief, a British limited company and boxing registry that was hired as the official record keeper and registry of ABC. In its official capacity as official boxing registry and recordkeeper of ABC, BoxRec is authorized to keep a database of all fights sanctioned by ABC members as well discipline and other information the ABC deems essential, and provides its services worldwide, including in this District.

b. JOHN SHEPPARD (hereinafter also referred to "Sheppard"), on information and belief the founder and an owner of BoxRec, and the person tasked with the supervision of the employees and many volunteers who diligent reporting of event results worldwide makes the BoxRec database possible. On belief and information, at all relevant times, Sheppard was an officer, manager, employee and/or agent of BoxRec, directly or indirectly. Sheppard is sued in his capacity as an officer, employee and agent of the BoxRec as well as in his individual capacity for his *ultra vires* acts, and for some of his actions, on belief and information, were not sanctioned by the BoxRec or the ABC and/or were not authorized in the constitution, bylaws and other governing rules and regulations

10

of same. Sheppard on belief and information, is a natural person employed by Defendant BoxRec as its most senior manager and supervisor at all times relevant.

c.   MARINA SHEPPARD (hereinafter also referred to "M.Sheppard"), on information and belief, an appointed official of the BoxRec also tasked with the management and supervision of the activities of the entity. On belief and information, at all relevant times, M.Sheppard was an officer, manager, employee and/or agent of the BoxRec, directly or indirectly. M.Sheppard is sued in her capacity as an officer, employee and agent of the BoxRec as well as in her individual capacity for her *ultra vires* acts, and for some of her actions, on belief and information, were not sanctioned by the BoxRec or the ABC and/or were not authorized in the laws and other governing rules and regulations of same. M.Sheppard, on belief and information, is a natural person employed by Defendant BoxRec as one of its most senior managers and supervisors at all times relevant. On belief and information M.Sheppard may very well be the true power behind the BoxRec throne.

d.   SAMSON LU (hereinafter also referred to "LU"), on information and belief, an appointed official of the BoxRec tasked with the registration of Boxing commissions in Asia, including the United Emirates, and responsible enforcement of the ABC rules and regulations governing commissions, the listing of events, licensing, and discipline. On belief and information, at all relevant times, Lu was an employee and/or agent of BoxRec, directly or indirectly. Lu is sued in his capacity as employee and agent of the BoxRec as well as in his individual capacity for his *ultra vires* acts, as some of his actions,

on belief and information, were not sanctioned by the BoxRec or the ABC and/or were not authorized in the bylaws and other governing rules and regulations of same. Lu is a natural person employed by Defendant BOXREC as manager and supervisor in its Asia operations at all times relevant.

e. ASSOCIATION OF BOXING COMMISSIONERS (hereinafter also referred to the "ABC"), on information and belief, an association of United States State, Native American, and international boxing commissioners, and an organization which has committed itself in large part to good governance and the regulation of boxing the United, including in this District. BoxRec, the Association of Boxing Commissions and their co-conspirators in suppressing the results of the Event are collectively also referred to as the "ANTITRUST ACTORS."

f. ROUND 10 BOXING (hereinafter also referred to the "Round 10"), on information and belief, an entity organized under the laws of the UAE and that was granted a permit or Certificate of No Objection (NOC) by the United Arab Emirates Boxing Federation (UAEBF) to operate a gym, promote fights and/or otherwise offer its services to the public as a boxing entity. At all times relevant, Round 10 was owned and controlled by Defendant Ahmed Seddiqi. At its inception, Round 10 had at least one other owner, which owner is not made party to this lawsuit as he has not undertaken any acts known to Plaintiffs that would make such owner a co-conspirator to the acts complained of herein.

g. AHMED SEDDIQI (hereinafter also referred to "Seddiqi"), on information and belief, a person of the full age of majority and Citizen of the United Arab Emirates. On belief and information, at all relevant times, Seddiqi was an

owner, officer, employee and/or agent of Round 10 Boxing as well as Dubai Boxing Commission and was an agent of BoxRec directly or indirectly. Seddiqi is sued in his capacity as officer, employee and agent of Round 10 and Dubai Boxing Commission as well as agent of BoxRec. Further, Seddiqi is being sued in his individual capacity for his *ultra vires* acts, and for some of his actions, on belief and information, were not sanctioned by the Round 10, Dubai Boxing Commission or BoxRec and/or were not authorized in the bylaws and other governing rules and regulations of same. Seddiqi is the genesis of the acts that are complained of herein. Seddiqi is central part of the conspiracy to suppress complained of herein and his subordinates such as Defendant Jose Mohan, his business partner Daniel Kinahan as well as several other co-conspirators acting in part under his direction. Seddiqi forms the matrix the genesis conspiracy to suppress complained of herein.

h.  JOSE MOHAN, (hereinafter also referred to "Mohan"), on information and belief, is Seddiqi's lackey and go-to man. Mohan serves at the pleasure of Seddiqi and is tasked with the day to day running of Round 10 Boxing, DBC and other affairs assigned to him by Seddiqi. On belief and information, at all relevant times, Mohan was an employee and/or agent of the Seddiqi, MTK, Round 10 Boxing, and DBC as well as an agent of BoxRec, directly or indirectly. Mohan is sued in his capacity as employee and agent of Round 10 Boxing, DBC, MTK  and BoxRec as well as in his individual capacity for his *ultra vires* acts. Some of his actions, on belief and information, were not sanctioned by the entities on whose behalf he was acting and/or were not

authorized in the bylaws and other governing rules and regulations of the said
entities.

i.  MTK Global (hereinafter also referred to the "MTK"), on information and
belief, an integrated Boxing and MMA conglomerate founded by Irish
"businessman" Daniel Kinahan and his partner, former boxer Mathew Macklin.
MTK on belief and information is an entity with operations worldwide,
including the United States State, the UAE, and internationally, including in
this District. At all times relevant, MTK maintained boxing promotion
operations that competed and continues to compete with Plaintiff Mendy and
Lion Heart Boxing Productions in the UAE.

j.  DANIEL KINAHAN (hereinafter also referred to "Kinahan"), on information
and belief, a person of the full age of majority and Citizen of the United
Kingdom and now a resident of United Arab Emirates. On belief and
information, at all relevant times, Kinahan was an owner (directly or indirectly),
officer, employee, "Consultant" and/or agent of MTK Global, was the
controller of MTK Global, directly or indirectly, and was person who directed
BoxRec to suppress the results of the Event, the genesis of BoxRec's
blackballing of Promoter. Kinahan is sued in his capacity as officer, employee,
Consultant, and agent of MTK Global as well as in his individual capacity for
his *ultra vires* acts, as his actions in causing the suppressing of the results of the
Event and other acts may not have been sanctioned by MTK Global and/or were
not authorized in the bylaws and other governing rules and regulations of MTK
Global. On belief and information, Kinahan's action were motivated in part by

the mistaken belief that Promoter Mendy and his event partners came into MTK Global's backyard (Dubai) and disrespected not only MTK Global's local partners Ahmed Seddiqi, Round 10 Boxing and Dubai Boxing Commission but also disrespected him by extension. On belief and information, Kinahan is a larger than life figure towering over the Sport of Boxing and controls not only top fighters but also some of the largest and most successful promoters in the sport today.

k.  Does 1 through 20. The true names or capacities, whether individual, corporate, associate or otherwise, of the Defendants named herein as Does 1 through 20 are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names, and Plaintiffs will amend this complaint to show their true names and capacities when the same have been ascertained. On belief and information Does 1 through 20, conspired with BoxRec, various ABC employees, Sheppard, M.Sheppard, Lu, Round 10 Boxing, Dubai Boxing Commission, Seddiqi, Mohan, MTK Global, Kinahan and other conspirators not currently known to Plaintiff, in order to not only suppress the entry of the results of the April 10, 2021 Event into BoxRec's registry of results but also to engage in a campaign to disrupt the Plaintiff Mendy's boxing operations initially in the UAE and now internationally, and to defame Plaintiff Mendy and his Lion Heart Boxing Productions and other boxing operations.

## FACTUAL BACKGROUND

### The April 10, 2021 Event (the "Event")

28. On April 10, 2021 a boxing event (the Event), an event took place at the Arabian Ranches Golf Club in Dubai, United Arab Emirates (UAE).

29. The Event was organized by Emirates Sports in association with Lion Heart Boxing Productions and the official promoter of record for the Event was Plaintiff Edward Bissau Mendy, an American promoter, and his business Lion Heart Boxing Productions, an American company.

30. Emirates Sports, one of the oldest and most active sports promotion company in the United Arab Emirates, also served as co-promoter of the Event.

31. The Event was sanctioned and supervised by the United Arab Emirates Boxing Federation (UAEBF) which by UAE law is the sole entity responsible for the regulation and supervision of Boxing in the Emirates, both professional and amateur.

32. The Event also was sanctioned and was supervised by the World Boxing Council (WBC), the oldest professional boxing sanctioning body.

33. In one of two main events, women's boxer Ivana Habazin, a former world champion, fought a ten-round fight for a WBC regional title, the inaugural WBC Middle East welterweight title.

34. The fight, which ended when Habazin's opponent, Nana Chakhvashvili, did not come out for round three, can be seen in its entirety on Fite.TV.

35. Even though Habazin won by knockout, Chakhvashvili is currently listed as 7-16 on BoxRec. She has been stopped twice in little more than two months, but no promoter, boxing commission or network programmer could discover that from looking at BoxRec, in violation of the Boxing Act.

36. Habazin has since been rendered "inactive" by BoxRec as her fight and historic title accolade does not even register on her record.

37. The co-feature that night saw women's boxing legend Layla McCarter defeat another Georgian, Elene Sikmashvili, currently listed as 9-9 on BoxRec. That fight is also suppressed by BoxRec but undoubtedly took place as can be seen on Fite.

38. Present at the event was former champion Amir Khan, as a WBC representative. It was Amir Khan who presented Habazin with the WBC belt after her win. After the event, Amir Khan, a prominent ambassador of the sport and a popular former world champion, did all he could to get BoxRec to recognize Habazin's WBC title win, all to no avail.

39. Even the WBC president, Maurico Sulaiman, tried to get BoxRec to record the WBC title fight result, if nothing else, also to no avail.

40. On belief and information, the Habazin fight is the only WBC title fight of record, certainly in the last century, which has not been recognized and recorded by BoxRec.

41. The fight of the night of the Event featured a so-called "One O Must Go" fight between Welterweight Prospect and former WBO Africa Champion Brendon Denes (11-0), (8-0 on BoxRec, against Ahmed Dawrani (8-0). The well-matched fight went the distance. While Denes won the fight his efforts were in vain as that fight also has not been recorded by BoxRec to this day.

42. Denes was considered inactive and has lost his top ranking despite three fights in the last year, all of which BoxRec has failed to record.

43. Ahmed Dawrani, now also promoted by Mendy, sports an unblemished record despite his April 10, 2021 loss to Denes.

44. Sadly, also on the card was Sebastian Eubank, a dear friend of Plaintiff Mendy and an event copromoter. Eubank is from a prominent boxing family and is the son of two-time Middleweight World Champion Chris Eubank. Sebastian Eubank fought the fight of his life in the Walk-Out Bout, a lively fight that also went the distance against a very game opponent bent on an upset. The Eubank bout hung on the balance for much of its duration.

45. Unexpectedly, Seb Eubank subsequently passed away within months after the Event, from a drowning under unusual circumstances.

46. Needless to say, BoxRec has refused to add Eubank's last fight in his record despite pleas with BoxRec by his family members. BoxRec would not correct Seb Eubank's record even after he passed, not even on humanitarian grounds as requested by his wife.

47. Interestingly, stories are being bandied around by DBC and Round 10 Boxing, Mohan other Round 10 affiliates, blame Mendy For Seb Eubank's death by suggesting that the injuries from his last fight, at the Event, may have had a cause in his demise.

48. Lastly, the card featured three Emirati fighters who were doing their first professional boxing fights as professional debutantes, a first for the Emirates and a major milestone for the Sport of Boxing in the Emirates.

49. Prior to the Event, the UAE had only had a couple of Emirati professional fighters. Thus, the Event was a big boon for Emirati Professional Boxing by turning three Emiratis professional, all at the same time. However, none of the Emirati fighters on the card has their Pro Debut results recorded by BoxRec.

50. Two of the Emiratis won while the third drew. None of those Emirati fighter results have been recorded to date.

51. The UAEBF, a member of AIBA, and a strong proponent and adherent of international best practices in boxing, supervised the event and assigned the officials-judges, referees, and a ring doctor. The UAEBF is a regular host to many boxing events.

52. All fighters submitted their medicals, boxing licenses, and had to submit proof of a negative PCR test that had to be taken 24 hours before the official weigh-in for the Event, which took place on April 9, 2022.

53. The Event was held at the prestigious Arabian Ranches Golf Club and was sanctioned by not only the UEABF but also the Dubai Sports Council as well as the Dubai Tourism and Commerce Marketing Board (DTCM).

54. Further, the event was televised nationally in the UAE and across the Middle East and North Africa Region (26 countries and over six hundred million population) by Abu Dhabi Fight as well as streamed live across various social media platforms.

55. Additionally, the Event was televised by tape delay on Fite TV and in over 125 million USA homes using regional cable networks.

56. The organizers of the Event were celebrated in Dubai and internationally for a successful event as they pulled of an entertaining fight card and Event in the height of the Covid-19 Pandemic, using Social Distance best practices and adhering to then existing Dubai Covid Regulations.

57. Indeed, the Event was the first live sporting event in the Emirate of Dubai since the advent of the Coronavirus Pandemic, a feat only achieved by the organizers because of their strong relationship with Dubai regulators as well as their creativity, understanding of the regulatory environment and persistence in the face of obstacles.

58. After the event took place, the Event's organizers, including Mendy, and the UAEBF provided BoxRec with the official results of all fights that took place that night.

59. Yet, to date, BoxRec has refused to publish the results of the April 10, 2021 Event and has refused to include them in the boxers' records, claiming that the Event was not "sanctioned" as BoxRec has not approved the UAEBF as an ABC member.

60. Further, as push back to efforts to have the Event results registered by BoxRec, BoxRec and its officials John Sheppard, Marina Sheppard, and Sampson Lu, started making both private and public claims to the effect that the event was not professionally promoted and that the fights did not otherwise meet BoxRec standards.

61. Several of the Defendants, including Seddiqi, Mohan and Does 1 through 20 also joined the smear campaign to disparage the Event and Mendy.

62. In spite of the Defendants' unfair and unfounded misinformation campaign, Mendy continued to advocate on behalf of the Event and Event fighters and did all he could reasonably do, in order to have the Event results registered, all to no avail.

63. Shortly thereafter, on or about April 24, 2021, the Zimbabwe National Boxing and Wrestling Control Board, (ZNBWBC), acting in a supervisory role, and a BoxRec "approved" Commission, also submitted the official fight results on behalf of the promoter and Zimbabwean fighter Brendon Denes, who fought in the Event as outline above.

64. Like the UAEBF, BoxRec disregarded the results submitted by the ZNBWCB despite the ZNBWCB following its usual protocols and providing the information usually required of it by BoxRec as well as providing additional information requested by BoxRec.

65. Despite incessant effort by the Promoter, the fighters, fighter managers, the UAEBF, the ZNBWCB and others to cause BoxRec to record the results of the Event, BoxRec and its agents in the matter (Lu, Sheppard, and M. Sheppard) ignored and continue to ignore all pleas to record the event result. To date the BoxRec Defendants (BoxRec, Lu, Sheppard, and M. Sheppard) and have refused to budge. BoxRec simply would not enter the results of the Event in its database and boxing registry.

66. On information and belief, BoxRec's sole reason for its refusal to include the results of the Event is because of instructions it and the BoxRec Defendants received from MTK Global and its owner, Daniel Kinahan, to suppress the results.

67. On information and belief, BoxRec was instructed by MTK and Kinahan to exclude the results to teach Promoter and his copromoters, specifically Murad Hamed, a lesson for supposedly "disrespecting" MTK and its UAE partners Round 10, DBC and Ahmed Seddiqi, even though Promoter did not do anything that could in any way reasonably have been construed as disrespectful to MTK, Kinahan, Round 10 Boxing, DBC and/or Seddiqi. Mendy sole endeavor has been advocacy for the entry of the Event results.

68. While event co-promoter Murad Hamed did have an exchange of words with Seddiqi and may have called Seddiqi unpleasant names, Promoter had no advance knowledge of Murad Hamed's arguments with Seddiqi, did not condone same, and in no way would have endorsed the statements Mr. Hamed exchanged with Seddiqi.

69. The failure to record the result of the Event by BoxRec is the root cause of this lawsuit and the genesis of BoxRec's refusal to record other fights promoted by Promoter Mendy and events that Plaintiff Mendy is otherwise involved in.

**The Zimbabwe Event**

70. On December 11, 2021 yet another related boxing event (the Zimbabwe Event) took place in Harare, Zimbabwe.

71. The promoter of record for the event was Stalin Mau Mau and his company Mau Mau Promotions.

72. Edward Bissau Mendy and Lion Heart Boxing Productions participated as sponsors of a bout on behalf of Mendy's fighter Brendon Denes, paying for the fighter purses (both sides) and related expenses of the bout.

73. On belief and information, Stalin Mau Mau is the longest serving boxing promoter in Zimbabwe history and the Zimbabwe Event was promoted as part of his *Peanuts to Diamond* Series, a series whose events are routinely reported by BoxRec.

74. The Zimbabwe Event was sanctioned and was supervised by the ZNBWCB which by Zimbabwe law is the sole entity responsible for the regulation and supervision of Boxing in Zimbabwe, both professional and amateur.

75. Seven bouts were held that night including a fight featuring Lion Heart Boxing Productions fighter, Welterweight Prospect and former WBO Africa Champion Brendon Denes. Denes won his Zimbabwe Event fight after five tough rounds against an opponent trained to beat him by his former coach.

76. Despite his valiant effort and impeccable performance, Denes was refused another entry into his record.

77. As result, Denes was considered inactive for most of the past year and lost his top fifteen rankings despite two tough fights he had in the last year, and which BoxRec refused to record.

78. Not one of the other fight results related to the Zimbabwe Event has been recorded to date.

79. Like the UAEBF did for the Event, the Zimbabwe event was supervised by the ZNBWCB and the ZNBWCB assigned the judges, referees, and a ring doctor.

80. All fighters submitted their medicals, bloodwork, boxing licenses, and had to submit proof of a negative PCR test that had to be taken 24 hours before the official weigh-in which took place.

81. The event also met all ZNBWCB regulations and well as local rules and regulations.

82. The Zimbabwe Event further was streamed on the internet and copies of the fight as well as the Zimbabwe Event results were provided to BoxRec.

83. After the event took place, the ZNBWCB provided BoxRec with the official results of all fights that took place as well as other pertinent event information.

84. Yet, to date, BoxRec has refused to publish the results or include them in the boxers' records. No plausible reason has been given for BoxRec's failure to enter the results of the Zimbabwe Event.

85. It is expected that BoxRec will use as justification for its action the pretext that it has not approved the ZNBWCB as a reporting member, and perhaps proffer false claims that the Zimbabwe Event was not professionally promoted and/or the fights did not otherwise meet its standards.

86. As with the Dubai Event and the UAEBF, BoxRec disregarded the results submitted by the ZNBWCB and refused to enter the results of the Zimbabwe Event into its database and boxing registry despite the fact that the ZNBWCB has met the universally

accepted requirements for the verification of fights and entry into boxing registers and the fact that ZNBWCB provided all the information asked of it by BoxRec.

87. Despite the best efforts by the Promoter, the fighters (including Plaintiffs), fighter managers (including Muniz), the ZNBWCB and others to cause BoxRec to record the results of the Zimbabwe Event, BoxRec has refused to do so. It continues to ignore all pleas by Plaintiffs and has failed to add the results of the Zimbabwe Event in its database.

88. On information and belief, BoxRec's sole reason for its refusal to include the results of the Zimbabwe Event is because of its continuing 'blacklisting' of Mendy as a result of instructions one or more of the BoxRec Defendants had received from MTK Global and its owner, Daniel Kinahan.

**The Brazil Event**

89. On February 5, 2022, a third related boxing event (the Rio Event) took place in Rio De Janeiro, Brazil.

90. The promoter of record for the Brazil Event was Edward Bissau Mendy and Lion Heart Boxing Productions.

91. The Event was sanctioned and was supervised by the Brazilian Boxing Association (in Portuguese known as "Association Brazil de Pugilism" and hereinafter also referred to as the "BBA"), which by Brazil  law is one of many entities recognized to supervise professional boxing events and is responsible for regulation and supervision of Boxing in Brazil, both professional and amateur.

92. On belief and information, the BBA is one of the largest boxing organizations in Brazil, if not largest boxing organization in that country. It operates throughout Brazil and has almost sixty affiliated chapters.

93. Seven amateur bouts and two professional bouts were held on the night of February 5, 2022, including the two professional fights featuring two Olympians doing their professional debutante fights.

94. To preempt any problems with BoxRec, Mendy decided to and did take BoxRec's and BoxRec owner John Sheppard's advice that international events promoted by Mendy be supervised by an ABC affiliated Commission, a European Commission or other BoxRec approved reporting commission to ensure the "sanctioning" of such events and entry of their resulting in BoxRec's database and boxing registry.

95. In advance of the Brazil Event, Mendy contacted and successful convinced Adam Roorbach and the Kansas State Athletic Commission to supervise the Brazil Event.

96. The KSAC contacted ABC and its President Michael Mazzulli to secure a pre-approval from the ABC and BoxRec of the KSAC's supervision of the Brazil Event.

97. The ABC granted the KSAC approval to supervise the Brazil Event.

98. BoxRec voiced no objection the KSAC's supervision of the Brazil Event.

99. The KSAC, assuming that BoxRec had no issue with its supervision of the Brazil Event, supervised the event as per its rules and regulations as well as ABC guidelines.

100. Despite the supervision of the KSAC and BBA authority to sanction fights, BoxRec refused to list the Brazil Event or add the results of the Brazil Event in its database.

101. Not one of fight results related to the Brazil Event has been recorded to date.

102.    Like the UAEBF and the ZNBWCB did for their respective Events, the BBA assigned event officials, including the judges, referees, and a ring doctor.

103.    Further, the ABC and the KSAC sent a representative from Brazil MMA (a BoxRec approved entity) to attend the Brazil Event to ensure it took place and verify that same was professionally done.

104.    All the fighters submitted their medicals, boxing licenses, and had to submit proof of a negative PCR test that had to be taken 24 hours before the official weigh-in which took place February 4, 2022.

105.    The Brazil Event met all KSAC, ABC and BBA rules and regulations and well as local laws, rules, and regulations. [When the Fire Marshall would not approve of the hosting of the event at the original venue, the mansion of a sponsor, due to potential fire hazard, the organizers quickly moved the event to BBA's gym, which met the approval of the Fire Marshall.]

106.    The Brazil Event was streamed on the internet and a Brazil MMA representative approved by the ABC and the KSAC attended the event on behalf of the ABC and the KSAC, in furtherance of the KSAC's supervision of the event, following the very prescription provided by BoxRec.

107.    After the Brazil Event took place, the KSAC provided BoxRec with the official results of the two professional fights that took place and other pertinent information.

108.    Yet, to date, BoxRec has refused to publish the results of the Brazil Event and has refused to include the results in the boxers' records.

109.    No plausible reason has been given for BoxRec failure to enter the results of the Brazil Event.

110.   BoxRec sole explanation of its decision not to include the results of the Brazil Event in its database is that it has an exclusive contract with an organization in Brazil and only sanctions and recognizes the results of fights approved by that organization.

111.   On information the BoxRec Defendants even lied about the basis for the exclusive relationship it had with their approved commission stating that the exclusive arrangement was entered into before by contract and before the ABC's contract with BoxRec.

112.   It is expected that BoxRec additionally will use as justification for its action the pretext that it had not approved the BBA as a reporting member, false claims that the Brazil Event was not professionally promoted and/or that the fights did not otherwise meet its standards.

113.   The BoxRec Defendants, particularly Sheppard and M.Sheppard, incessantly represent or insinuate the Mendy was promoting fights improperly one way or another.

114.   As with the Dubai Event and the Zimbabwe Event, BoxRec disregarded the results submitted by the KSAC and BBA as supervising commissions despite the fact that the KSAC and BBA provided all the information asked of them by BoxRec.

115.   Despite additional efforts by the Promoter, the fighters, fighter managers, the KSAC, the BBA, the ABC, and others to cause BoxRec to record the results of the Brazil Event, BoxRec has refused to do so.

116.   To date, BoxRec has failed to add the results of the Brazil Event into its database and continues to ignore all pleas to add the results in its database.

117.   On information and belief, BoxRec's sole reason for its refusal to include the results of the Brazil Event is for the same reason that the other two events were recorded:

BoxRec's blacklisting Mendy as a result of instructions it received from MTK Global and its owner, Daniel Kinahan. Nothing else.

**The Beat Down Event**

118.   On March 4, 2022, a final related boxing event (the Zimbabwe Event) took place in Harare, Zimbabwe.

119.   The promoter of record for the event was Deltaforce Boxing Academy in association with Lion Heart Boxing Productions, with Edward Bissau Mendy as official copromoter.

120.   Edward Bissau Mendy's fighter and Plaintiff Brendon Denes fought in the main event and won.

121.   The Beat Down Event was sanctioned and was supervised by the ZNBWCB.

122.   Ten bouts were held that night.

123.   Interestingly, the results of the Beat Down Event were immediate published despite the event be promoted in part by Edward Bissau Mendy and Lion Heart Boxing Promotions and being 100% funded by Edward Bissau Mendy.

124.   The Beat Down Event followed all ZNBWCB regulations and well as local rules and regulations no more than the Zimbabwe Event did.

125.   After the event took place, the ZNBWCB provided BoxRec with the official results of all fights that took place as well as with videos of the results and other pertinent event information requested by BoxRec, as it did for the other event.

126.   To validate Plaintiffs' theory that Defendants are engage in a conspiracy to suppress Mendy, Mendy did not publish any press releases to have his name or Lion Heart

Boxing Productions listed as promoter of the Beat Down Event even though he financed same and was actively involved in its promotion.

127. Lo and behold, BoxRec published the results of the Beat Down Event and included them in the boxers' records within 24 hours of their submission, and without questioning anything submitted.

128. Unbeknownst to the BoxRec Defendants and their co-conspirators, Mendy is beneficial owner of a majority stake in the Pound for Pound Series, and the funder of the Beat Down Event.

129. BoxRec's failure to enter the results of the fights complained of hereinabove is a violation of the Muhammad Ali Act, its boxing register contract with the ABC and its duty as professional boxing register.

130. On information and belief, BoxRec's sole reason for its refusal to include the results of the said events is arbitrary, capricious, discriminatory, a violation of the Sherman Act as well as the RICO Act as it is in furtherance of a conspiracy centered around and/or originating with MTK Global and its owner, Daniel Kinahan.

131. More specifically, BoxRec's refusal to update Ivana Habazin's record with the WBC title included is in violation of the ABC's Official Record Keeper Criteria (hereinafter also referred to the "ABC Criteria"), Rule 15, which provides for Boxing Registry recording of "world title bouts sanctioned by the International Boxing Federation (IBF), World Boxing Association (WBA), World Boxing Council (WBC) and the World Boxing Organization (WBO)."

132.    Another violation is the refusal of BoxRec to update the records of all of the other European fighters who participated in the Event, including the late Seb Eubank, and the Georgian fighters. *Id.* ABC's Official Record Keeper Criteria Rule 14.

133.    An additional violation is the refusal of BoxRec to update the records of Brazilian fighters (as South Americans) who participated in the Brazil Event, including the Brazilian Olympian fighters (Patrick Lourenco and Michel Borges). *Id.*

134.    Yet an additional violation is the refusal of BoxRec to update the records of an American fighter (Layla McCarter) who participated in the Event. *Id.*

135.    Another violation is the refusal of the entry of the results of fighters issued a federal identification number by the KSAC (the Brazil Event). See ABC's Official Record Keeper Criteria Rule 11(g).

136.    A final violation is the refusal to include the results of ABC member supervised events (the Brazil Event supervised by the KSAC). See ABC's Official Record Keeper Criteria Rule 3.

137.    The only fighters possibly not covered by the ABC Criteria's guidelines are the African fighters. Other than Denes, who is African, all other results should have been recorded and are only not record because of BoxRec's bad faith, its collusion with Mendy's competitors, its failure to follow the ABC Criteria as well as other rules and regulations applicable to boxing registers, on belief and information, all in furtherance of the conspiracy to teach Mendy a lesson and suppress his rise and the rise of his business, Lion Heart Boxing Productions.

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE PROFESSIONAL BOXING SAFETY ACT OF 1996, AS AMENDED BY THE MUHAMMAD ALI PROFESSIONAL BOXING REFORM ACT OF 2000, 11 U.S.C 6301 ET SEQ. (Against BoxRec and the Association of Boxing Commissions)**

138.   Plaintiffs incorporate the allegations of paragraphs 1 through 137 above.

139.   As preliminary matter, plaintiffs believe that it may be helpful to provide

background information on the Defendants ABC and BoxRec, and their actions.

**About ABC**

140.   The ABC was organized as a non-profit organization under Pennsylvania law.

141.   Its stated missions are as follows:

(A) To promote the continual improvement of, and for, professional boxing;
professional and amateur mixed martial arts; and other professional and amateur
unarmed combat sports (hereinafter, "combat sports").

(B) To promote the uniformity of health and safety standards and other requirements
pertaining to the conduct of combat sports events.

(C) To promote standard reporting of combat sports events between members,
including results, injury reports, suspensions and other medical information.

(D) To encourage communication, cooperation and uniformity in the supervision and
regulation of combat sports among the members of the ABC.

(E) To publish and disseminate medical and training information, and to promote and
hold seminars for the continuing education of all officials, ringside physicians,
commissioners and commission employees.

(F) To establish and operate a charitable foundation which will accept donations to a
charitable fund for indigent boxers with elected officers and members of the ABC
Board of Directors serving on the board of governors and as trustees of this fund.

(G) To encourage adherence to, and enforcement of, applicable federal laws by each
member of the ABC.

142.   ABC was formed when a small group of executive directors of boxing commissions

and commission members themselves decided to get together to just talk about how

they handled boxing in their jurisdictions and better their processes.

143.    Eventually, the original small group developed into each state commission, as well as four Native American boxing commissions becoming members of the ABC. Furthermore, some Canadian Boxing Commission provinces are associate members. The ABC official website is www.abcboxing.com.

144.    The ABC made a commitment to standardize the requirements to obtain a boxing license as mandated by the Boxing Acts.

145.    Among the positive changes that the ABC produced was the formation of a National Suspension List. This was initially developed and maintained by the Florida Boxing Commission. Eventually, this program was turned over to Fightfax, Inc.

146.    With the National Suspension List, anyone around the world having Internet access can see the list of boxers who are currently on medical and disciplinary suspension or revocation in the United States. This is a free service that is updated three times per week and is now under BoxRec by delegation of the ABC.

147.    Another major problem resolved by the ABC was the issue of boxers using false names. Thanks to Senator John McCain, the Professional Boxing Safety Act was passed in 1996.

148.    Under the supervision of the ABC, each boxer now must be issued a federal ID card from his or her home state boxing commission by producing picture identification. International boxers may register with any commission. This has essentially stopped boxers from using false names and perhaps even fighting while on suspension.

149.    Generally, commissions in the US are created to protect the health, safety, and welfare of boxers through licensing and regulation of the sport.

150.    Commissions were also created to regulate the sport to insure fair and impartial

judgment is used when assigning officials to work events and when disciplining licensees for violations of the law.

151.     The ABC under the direction of Greg Sirb, former ABC President, and the National Association of Attorney General's "Boxing Task Force" worked to improve conditions for fighters and developed the Boxers' Bill of Rights.

152.     On belief and information, the ABC has been a positive force in boxing and has been responsible for removing a lot of the shenanigans in the sport, removing boxer fraud, standardizing rules, and implementing practical solutions based on the Professional Boxing Safety Act and the Muhammad Ali Act.

153.     The ABC position was solidified by both acts and a majority of its funding is the direct result of the importance the Boxing Acts placed on the ABC.

154.     Pursuant to the Professional Boxing Safety Act, the ABC was tasked with the maintenance of professional boxing record and the creation or selection of a boxing register to that end.

155.     As a result of its mandate, the ABC created guidelines for the selection of a boxing register (the ABC Criteria) and eventually selected BoxRec in 2016, on belief and information to act as official boxing register, taxed with maintaining the ABC's boxing database as well as all recordkeeping mandated under the Boxing Acts. [Neither BoxRec nor ABC has been forthcoming with a copy of their contract.]

**About BoxRec**

156.     Defendant BoxRec is a registrar of boxing results and a "boxing register" under the Professional Boxing Safety Act.

157.    Prior to its exultation to official record-keeper (Boxing Register) of the ABC, BoxRec was one of many hobbyists run websites that record fights and fighter results.

158.    BoxRec was considered inferior to the extant unofficial official record keeper of boxing, Fight Fax, and to many online record keeping services by the ABC's own assessment. Despite its inferiority, the ABC selected BoxRec as its boxing register.

159.    Since its promotion to ABC boxing register, not only has BoxRec become the official record keeper of the ABC but also it has evolved the unofficial bible and sole universally recognized boxing register of boxing records, in part due to the ABC stamp of approval as well as the dedication of John Sheppard and an army of loyal hobbyist and boxing enthusiasts who form a network of reporters and investigators of boxing records.

160.    On belief and BoxRec listed the records of over 700,00 active and non-active professional fighters, along with the results of over Two Million bouts dating to 1889, the date of the widespread adoption of gloved boxing under the Marquess of Queensberry Rules.

161.    For many boxing fans, the BoxRec website is "a door to the past." It is also an unofficial rite of passage to research fighters and one's fighter favorites.

162.    For people in the boxing business such as Plaintiffs (promoters, managers, matchmakers, athletic commissions, and sanctioning bodies all around the world), BoxRec is an essential tool that is used to find opponents, to track medical suspensions, and to record fight card results once the last bell has rung.

163.   Matchmakers also use BoxRec ratings and records to handicap fighters and otherwise determine which matches to make fights.

164.   While many boxing professionals used BoxRec before 2016, it was only after the ABC made BoxRec the sport's official record keeper in the United States, on information and belief,  that the BoxRec become the industry standard.

165.   BoxRec is free, relatively fast, and comprehensive.

166.   As a result of the ABC' selection of it, BoxRec becoming the Boxing's most valuable reference source and highest trafficked website, with an estimated 100,000 daily unique visitors and two million monthly visitors, is no real surprise.

167.   On belief and information, BoxRec was founded by Sheppard and his wife Marina. Sheppard is a British computer programmer whose historical hobby grew into the data leviathan at the center of today's boxing infrastructure.

168.   BoxRec was started on or about 1995 by John Sheppard, then a computer systems analyst living in Doncaster, the British coal town where he grew up. Sheppard did not like boxing, but he did happen to be friends with the brothers of "Prince" Naseem Hamed, from nearby Sheffield, including Murad Hamed.

169.   As a result of the friendship, Sheppard was recruited to assist with the Naseem Hamed fights and related promotions. As scouting opponents was cumbersome back then, Sheppard decided to start a database of fighters for scouting purposes. It was this database that eventually would become BoxRec.

170.   Sheppard built a private database containing the records and biographical information of about 20,000 British fighters. Around the same time, Sheppard had

become an active member of an internet forum consisting of boxing enthusiasts who liked to track down and trade win-loss records. When he mentioned his database to the group, they convinced him to turn it into a website, so they could add their own collections and begin creating an online archive for the sport.

171.    On belief and information, on or about May 9, 2000, BoxRec went live.

**BoxRec's Boxing Register Mandate**

172.    Prior to 2016, and under former ABC President, Timothy J. Lueckenhoff (2001-2015), BoxRec was one of several hobbyists run websites dedicated to recording fighter records.

173.    While it had a fanatical army of volunteers it was nowhere near a powerhouse in boxing. Fight Fax and a host of other websites were more prominent as boxing registers.

174.    Indeed, Fight Fax was then recognized by most boxing enthusiasts and professionals as the boxing bible, as a boxing register that provided the most comprehensive and accurate results.

175.    Even the ABC recognized BoxRec's shortcomings and stated that it would not provide BoxRec with official boxer registry status, on information and belief, due to its failings and more importantly its inaccuracies.

176.    On information and belief, evidence of BoxRec's incompetence and continued failure was detailed in a 2017 complaint to the United States Federal Trade Commission (FTC), which had jurisdiction over enforcing the Muhammad Ali Boxing Reform Act.

177.    The FTC complaint was later supplied to the ABC by various sources, but the ABC ignored it and chose to keep using BoxRec to the exclusion of Fight Fax and other boxing registers that were more accurate.

178.    On information and belief, the FTC never acted on the 2017 FTC Complaint.

179.    The items in the FTC complaint fall into two distinct categories:

   a.    BoxRec's flawed process for record updating and recording, a process that is prone to misuse by unscrupulous people with a personal stake, such as promoters and managers.

   b.    BoxRec's failure to update boxers' records submitted by a number of recognized boxing commissions since April 2016.

180.    Further, in August 2016, shortly after the appointment of BoxRec as the official registry, then ABC President Michael Mazzulli was presented with the allegations of BoxRec's failings.

181.    In an e-mail Mazzulli wrote to BoxRec dated September 6, 2016, he stated, "all ABC Boxing record keepers will actively recognize and record all pro boxing contests for all commissions that are sent in by those boxing commissions recognized by the ABC." BoxRec has failed to comply with the ABC's directive, but Mr. Mazzulli and the ABC executive board took no action against the recordkeeper, instead, choosing to ostracize those that alert the ABC of BoxRec's failings and wrongdoing.

182.    Even more disturbing is BoxRec's direct defiant of the ABC by refusing to enter the result of an ABC supervised event, the Brazil Event, even after the ABC ordered it to put it in its database.

183.    BoxRec reluctantly added the results in the Brazil Event in ABC database but has locked and prevented the results from public viewing. Thus, the fight records have no indication of the outcome of the bouts when viewed by members of the public.

184.    Disturbed by BoxRec's actions with regard to the Dubai Event, Charles Muniz, manager of Habazin, wrote a letter in May 2021 to acting ABC President Mr. Brian Dunn, asking the ABC to intervene.

185.    In response to the letter, Mr. Dunn wrote the following: "I am sorry to hear about this situation. Unfortunately, I am afraid there is nothing I can do to help resolve it."

186.    Dunn's explanation was that while BoxRec is the official record keeper of the ABC, it is also a private company that is "not even based in the United States" and cannot be "reeled' in by the ABC.

187.    Subsequent to Mr. Dunn's response, several more emails were sent to him and the ABC executive committee asking for a copy of the BoxRec contract under the Freedom of Information Act (FOIA), among other requests, all of which have been ignored.

188.    Effectively, the ABC, a non-profit government entity has awarded a contract to a foreign private company and contracted to serve as its official record keeper tasked with enforcement of the recordkeeping function of the Professional Boxing Safety Act, as amended by the Muhammad Ali Act, but without retaining any supervision over BoxRec.

189.    If the ABC and its executives are to be believed, the ABC has not retained of jurisdiction over BoxRec and has no power to override BoxRec's decision.

190.    Thus, by the ABC's own admission, it has given BoxRec free reign to function as it pleases with absolutely no oversight or accountability.

191.    This a clearly a violation not only of the ABC's own rules and regulations but also of the Professional Boxing Safety Act and the Muhammad Ali Act as well as the ABC's own guidelines for boxing registers.

**The Genesis of BoxRec's Arbitrariness Towards Promoter Events**

192.    The April 10, 2021 Dubai Event (the Event) is the genesis of this litigation.

193.    It is also the beginning of BoxRec's seeming blacklisting of Promoter Mendy.

194.    Prior to this event, Mendy had good relationships with BoxRec and its owners Sheppard and M.Sheppard. Mendy has no known problems with BoxRec.

195.    Prior to the Event and the machinations of Defendants Round 10, DBC, MTK, Seddiqi, Mohan, Kinahan and those conspiring in concert with them, Plaintiff Mendy has had a very cordial relationship with BoxRec and its owners.

196.    Plaintiff Mendy's friend and event partner Murad Hamed also had a great relationship with the BoxRec and its Founder Sheppard. Indeed, BoxRec was started while John Sheppard was working for Prince Hamed, Murad Hamed's brother, and their family promotions company.

197.    On belief and information Defendants Round 10, DBC, MTK, Kinahan and Seddiqi are the SOLE cause of Plaintiff Mendy's problems with BoxRec, its refusal to list the Event, recognize the results of event associated with Mendy and otherwise recognize the UAEBF as a reporting commission, even though the UAEBF is the only legally sanctioned commission under UAE law.

198.    On belief and information, MTK owner Daniel Kinahan and his business partner Ahmed Seddiqi were personally involved in the decision and execution of conspiracy in collusion with the BoxRec Defendants to suppress the results at issue.

199.   MTK and its business partners Round 10 Boxing, DBC, Kinahan and Seddiqi were Plaintiff Mendy's main competitors as boxing promoters in the UAE market prior to the Event.

200.   Prior to the arrival of MTK and Kinahan into the UAE Boxing scene, Mendy and his associates were the primary drivers of boxing in the UAE.

201.   Mendy has been promoting fights in the UAE since 2011 and was not only the promoter of record of the first professional boxing event in Abu Dhabi history but is one of the few non-UAE promoters able to successfully navigate UAE law and red tape to successfully promote legally sanctioned boxing events in the UAE.

202.   It is only recently that legally sanctioned professional boxing has started to proliferate in Dubai. Prior to the Covid-19 pandemic. one could count the number of professional boxing promoters in the UAE on one hand.

203.   On belief and information, the genesis of Plaintiff Mendy trouble with BoxRec stem from altercation(s) that Murad Hamed had with Seddiqi. On belief and information, Murad Hamed exchanged heated words with Round 10 Boxing and DBC owner Ahmed Seddiqi and on belief and information insulted him by calling him among other things, a "wannabe promoter" and "shopkeeper's son."

204.   While promoter Mendy has NEVER had any arguments with Seddiqi or otherwise acted in any untoward way towards Seddiqi, Mendy has been caught in the crossfire and made to suffer as a result of the beef between Seddiqi and Hamed.

205.   The word in the Dubai rumor mill in the weeks leading to the Event was that Round 10, DBC and MTK, through their employees and/or surrogates, were actively working with each other and others to suppress and otherwise sabotage the Event. Among other

things, fighters scheduled to fight at the Event were poached and/or talked out of fighting.

206.    Efforts by Plaintiff Mendy and others to mediate and otherwise amicably resolve of the BoxRec issue and to ensure that there was unnecessary bad blood or acrimony between the two groups (MTK and its UAE Partners and agents on one side, and the Event Promoters on the other side), have been unsuccessful.

207.    Plaintiff Mendy, the other Event Promoters, Event fighters and their managers contact BoxRec and the ABC in efforts to the Event results accepted, all to no avail.

208.    On its part, the ABC said that it could not do anything to convince BoxRec to act as it had no authority over event though it was the ABC that empowered BoxRec and anointed it official record keeper for Boxing.

209.    Similarly, BoxRec, Lu, Sheppard and M.Sheppard were unmoved using all kinds of flimsy excuses for its refusal to accept the result. Among the reasons tendered, included but were not limited to the following:

    a.  That the Event was not legally "sanctioned" under UAE Law.
    b.  That the Event was not granted the requisite permissions by regulators.
    c.  That the UAEBF was an amateur commission unable to supervise a professional boxing event.
    d.  That the UAEBF's powers and authority were limited to the Emirate of Abu Dhabi.
    e.  That only the DBC was a professional boxing commission in the UAE.
    f.  That only the DBC could sanction professional boxing events in Dubai
    g.  That the Event was not professionally conducted and produced.
    h.  That the fights were mismatches.
    i.  That the safety rules required by the ABC and BoxRec were not followed.
    j.  That judges did not properly score the Event bouts and results.
    k.  That Event officials were not qualified.
    l.  That the fights were horrible
    m.  That Event fighters were not paid as per their contracts.
    n.  That Event contractors also were not paid.
    o.  That the Event otherwise filed to meet BoxRec requirements.

210. There is not a single fighter that has ever fought for Plaintiff Mendy that anyone can point to or produce that has not been paid by Mendy as a result of any event that Plaintiff Mendy was involved with.

211. To add insult to injury, BoxRec, Sheppard, M.Sheppard and their fellow conspirators were making these false statements outlined hereinabove to fighters, fighter managers and all willing to listed (orally and in writing).

212. All efforts to cause them to cease and desist or to otherwise record the results of the fess on deaf ears.

213. Attempts by Plaintiff Mendy to right all wrongs related to the event, perceived or real, wrongs on Plaintiff Mendy's part and on the part of his partners, by apologizing and otherwise extending an olive leave to reach a truce so that Plaintiff Mendy and his partners could be left alone to focus on running their UAE events without any interference or adverse acts were unsuccessful.

214. While there has been interest expressed in amicable resolution of the BoxRec issue and its root causes, and let bygones be bygones and putting the issues behind them, all efforts by Plaintiff Mendy to resolve same have been unsuccessful to date.

215. Follow up efforts directly and through intermediaries did not yield any added information on resolution and did not lead to any amicable agreement to resolve differences with MTK, Round 10, DBC, Kinahan and Seddiqi.

216. Further, to this date, as of the date of the filing of this lawsuit, BoxRec has not recorded the results of the Event despite Plaintiffs' best efforts and the efforts of others (the UAEBF, the ZNBWCB, fighters, fighter managers, Event Promoters, and others with an interest in seeing the Event and its participants done justice).

217.    Plaintiff Mendy has since learned from various insiders of Defendants BoxRec and

MTK Global confirmation of what Plaintiff Mendy and his partners suspected all along

(that BoxRec was improperly influenced by the Dubai Boxing Commission and its

affiliated company Round 10 Boxing, Round 10 Boxing Partner MTK Global,

Kinahan, Seddiqi, Mohan, Lu, and/or Does 1 through 20 to keep the results of the event

out of BoxRec) indeed was true.

218.    Indeed, Seddiqi and Mohan, and their associates, have gleefully proclaimed for all

willing to listen to them that the Event results would "never get on BoxRec."

219.    Plaintiff Mendy has had meetings with and spoken to at least two people with direct

knowledge of Defendant's conspiracy to suppress the Event results and the fact that

MTK Global, Round 10 Boxing, Seddiqi, Mohan and their affiliates were solely

responsible for soliciting and convincing BoxRec, Sheppard, M.Sheppard and/or Lu to

not list the Event or record its results.

220.    At a meeting Mendy had with Kinahan, Kinahan informed Mendy that it was he

who directed them not to publish the results to teach Mendy and Hamed a lesson for

"disrespecting" his local partner Seddiqi.

221.    Given Kinahan's considerable power, on formation and belief the BoxRec

Defendants either willing acquiesced or were intimidated into following his

instructions. As a result, the Event results were not recorded and events association

with Mendy have been excluded from BoxRec. The only event promoted by Mendy

since then that has been recorded in the Beat Down Event and only because Mendy

intentionally downplayed his involvement.

**Adverse Effects of the Failure to Record Results**

222.   All the fighters that participated in the three promoter events at issue did their job.

223.   They prepared to compete, risked their lives, only to have the result of their efforts arbitrarily excluded by a website acting as the final judge and jury, while the ABC cannot do anything.

224.   The ABC did nothing to intervene and resolve the issues related the Event and Zimbabwe Event.

225.   The ABC did try to get BoxRec to enter the results of the Brazil Event, but BoxRec has refused to do anything. BoxRec has refused to enter the results regardless of the pleas made to it.

226.   BoxRec claims that it has an exclusive deal with another Brazil commission that is exclusive.

227.   Despite the best efforts of the ABC and the KSAC, BoxRec would not budge, in complete violation of the ABC's express mandate of protecting fighters' interests and the safety mandates of the Boxing Acts.

228.   Fighters knocked out at the Event, the Zimbabwe Event and the Brazil event never has their suspensions recorded.

229.   None of the fighters affected had the benefits of their fights. Staying active and building a winning record is how fighters move up in sanctioning organizations rankings. Higher rankings equate to higher purses. By not publishing fighters' results, the harm can be irreparable to boxers who may be denied consideration for big fights on the basis of their seeming inactivity.

230.   This behavior by BoxRec is not an isolated case, as other complaints have been lodged against the BoxRec and its managers over the past few years.

231.    Further, BoxRec claims they only publish results from approved commissions. That claim is totally false. A careful examination shows that they have published results of fights when no commission was even present.

    a.  Anthony Joshua vs Andy Ruiz, and Amir Khan vs Billy Dib in Saudi Arabia are just two of numerous instances, on belief and information.

    b.  No-commission cards held in Mexico during the height of the coronavirus pandemic had found their way onto BoxRec.

    c.  Further, BoxRec has listed contests on cruise ships and other venues without commissions or supervision by an ABC member commission.

232.    BoxRec further claims they only publish results from only a single commission in both in the UAE (DBC), a commission not used by the promoter for the Event. An examination shows that have had result published by BoxRec, shows that BoxRec arbitrarily publishes results of fights, including results for other promoters using commissions other than DBC.

    a.  On information and belief BoxRec has published results for fights supervised by outside/foreign commissions in Dubai.

    b.  BoxRec publishes results for four different commissions in Germany.

233.    BoxRec has refused to provide any forms or other requisite information to facilitate the acceptance of the UAEBF and the BBA as approved and reporting commissions.

234.    The reporting of accurate results in the United States and internationally is an important function of safety in boxing and of commerce in the United States. It is also, an integral part of and mandate of the Boxing Acts.

235.    BoxRec has willfully maintained and its power as a boxing register under the

Boxing Act and Muhammad Ali by conspiring with Sheppard, M.Sheppard, Lu, Seddiqi, Mohan, Round 10, DBC, MTK, Kinahan, and Does 1 through 20 to keep out the results of Promoter events, including the events that Promoter Mendy and Murad Hamed were involved with in the UAE, Brazil, and Zimbabwe.

236.   This conspiracy was to benefit Round 10, DBC, MTK, Seddiqi, Mohan, Kinahan and Does 1 through 20 and at the expense of their promoter rivals, including Plaintiff Mendy and his extant partners in the Event.

237.   The action of each conspirator should be imputed to the other as if done by each of them.

238.   ABC and BoxRec's exclusionary conduct and the actions of those acting in concert with them foreclosed the inclusion of the results of the Event and the other events complained of and resulted in a smear campaign against Plaintiff Mendy and his partners.

239.   The losses suffered by Plaintiffs include but is not limited to the absence of wins on the record of fighters, the absence of a title on the record of Habazin, the placement of Habazin, Denes, and others to inactive status, and the difficulty Plaintiff Mendy now experiences in the recruiting fighters or otherwise fighting the smears spread by the ABC and/or BoxRec, and their co-conspirators, all of which as violation of the Professional Boxing Safety Act and the Muhammad Ali Act.

240.   The actions of BoxRec and the complicity of the ABC in not enforcing its own guidelines and condoning BoxRec's action is in violation of the law.

241.   ABC and BoxRec's conspiracy and related anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

242.     ABC and BoxRec's anticompetitive and exclusionary practices violate Section 2 of

the Sherman Act, 15 U.S.C. § 2.

243.     The ABC's actions and/or inaction and BoxRec's exclusionary practices have

caused the Plaintiffs harm.

244.     As a result of ABC and BoxRec's anticompetitive and exclusionary practices and

the harm it has caused, Plaintiffs are entitled to damages in an amount currently

unascertainable but on belief and information is in excess of $1,000,000.00.

245.     Further, the Plaintiffs are entitled to cost of this litigation as well as attorney fees,

when hired or quantum meruit if no attorneys are hired.

246.     The Plaintiffs are also entitled to remedies this court may find suitable after trial of

the matter.

**SECOND   CLAIM   FOR   RELIEF:   CONSPIRING   TO   VIOLATE   THE
PROFESSIONAL BOXING SAFTY ACT AND THE MUHAMMAD ALI ACT
(Against ABC, BoxRec, John Sheppard, Marina Sheppard, Lu, Seddiq, Mohan,
Round 10, DBC, MTK, Kinahan, Does 1 through 20)**

247.     Plaintiffs incorporate the allegations of paragraphs 1 through 246 above.

248.     The actions of the ABC and BoxRec are a violation of the Professional Boxing

Safter Act and the Muhammad Ali Act (hereinafter also referred to as the Boxing Acts)

as outlined above.

249.     ABC and BoxRec further violated the said acts by conspiring with each other and

with Sheppard, M.Sheppard, Lu, Seddiqi, Mohan, Round 10, DBC, MTK, Kinahan and

Does 1 through 20 to keep out the results of the Event, the Zimbabwe Event, and the

Brazil Event, all in violation of the Boxing Acts.

250.     This conspiracy was to benefit Round 10, DBC, MTK, Seddiqi, Mohan, Kinahan

and Does 1 through 20 and at the expense of their promoter rivals, including Plaintiff

Mendy and his extant partners in the Event.

251.    The action of each conspirator can be imputed to the others, and each of them, as if done by each of them.

252.    The conspirators' conduct and the actions of those acting in concert with them foreclosed the inclusion of the results of the complained of events in the boxing registry in contravention of the mandates by the Boxing Acts and also resulted in a smear campaign against Plaintiff Mendy and his partners.

253.    The actions of the conspiracy have caused plaintiffs damages.

254.    The conspiracy, its exclusionary practices and other actions have caused the Plaintiffs harm.

255.    As a result of ABC and BoxRec's anticompetitive and exclusionary practices and the harm it has caused, Plaintiffs are entitled to damages in an amount currently unascertainable but on belief and information is in excess of $1,000,000.00.

256.    Further, the Plaintiffs are entitled to cost of this litigation as well as attorney fees, when hired or quantum meruit if no attorneys are hired.

257.    The Plaintiffs are also entitled to remedies this court may find suitable after trial of the matter.

**THIRD CLAIM FOR RELIEF: MAINTAINING MONOPOLY IN BOXING AND GENERAL BOXING RECORD KEEPING AND REGISTRY SERVICES IN VIOLATION OF SHERMAN ACT § 2**
**(Against ABC and BoxRec)**

258.    Plaintiffs incorporate the allegations of paragraphs 1 through 256 above.

259.    Boxing and the reporting of accurate results in the United States constitute a relevant antitrust market, and ABC and BoxRec has monopoly power in that market.

260.    ABC and BoxRec have willfully maintained and abused their monopoly power by

conspiring with each other and with Sheppard, M.Sheppard, Lu, Seddiqi, Mohan, Round 10, DBC, MTK, Kinahan and Does 1 through 20 to keep out the results of the Event, the Zimbabwe Event, the Brazil Event, and possibly other events in the UAE, the United States and worldwide.

261.    ABC and BoxRec have willfully maintained and abused their monopoly power by appointing BoxRec as the only boxing registers under the Boxing Acts and with the sole responsibility and ability to record ABC events.

262.    ABC and BoxRec also willfully maintained and abused their monopoly power by allowing themselves to be used by a racketeering enterprise to suppress a lowly promoter and deny entry of legally sanctioned events.

263.    BoxRec has willfully maintained and abused its monopoly power by arbitrary appointing itself a super commission able to override the rules and regulations of event countries and to impose it all rules and regulations, which it enforces selectively from country to country and promoter to promoter.

264.    BoxRec has willfully maintained and abused its monopoly power by entering to exclusive deals with various entities to exclude the reporting of legally sanctioned events (events that meets the legal requirements of the host country).

265.    BoxRec has willfully maintained and abused its monopoly power conspiring with Sheppard, M.Sheppard, Lu, Seddiqi, Mohan, Round 10, DBC, MTK, Kinahan and Does 1 through 20 to keep out the results of the Event, the Zimbabwe Event, the Brazil Event, and other events in the UAE, the United States and worldwide.

266.    This conspiracy was to benefit Round 10, DBC, MTK, Seddiqi, Mohan, and Does 1 through 20 and at the expense of their promoter rivals, including Plaintiff Mendy and

his extant partners in the Event

267.    The action of each conspirator should be imputed to the other as if done by each of them.

268.    ABC and BoxRec's exclusionary conduct and the actions of those acting in concert with them foreclosed the inclusion of the results of the events complained of herein and resulted in a smear campaign against Plaintiff Mendy and his partners.

269.    By the losses suffered by Plaintiff Mendy, the absence of wins on the record of fighters, the absence of a title on the record of Habazin, the placement of Habazin and others to inactive status, and the difficulty Plaintiff Mendy now experiences in recruiting fighters or otherwise fighting the smears spread by the ABC and/or BoxRec, and their co-conspirators, it is clear that the  anticompetitive acts have had harmful effects on competition, Boxing Professionals such as Plaintiffs, and consumers.

270.    The anticompetitive effects of ABC and BoxRec's conspiracy to violate the Sherman Act and to keep out the results of the Event and otherwise suppress Plaintiffs outweigh any procompetitive benefits in this market or can be achieved through less restrictive means.

271.    ABC and BoxRec's conspiracy and related anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

272.    ABC and BoxRec's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

273.    ABC and BoxRec's anticompetitive and exclusionary practices have caused the Plaintiffs harm.

274.    As a result of ABC and BoxRec's anticompetitive and exclusionary practices and

the harm it has caused, Plaintiffs are entitled to damages in an amount currently unascertainable but on belief and information is in excess of $1,000,000.00.

275.    Further, the Plaintiffs are entitled to cost of this litigation as well as attorney fees, when hired or quantum meruit if no attorneys are hired.

276.    The Plaintiffs are also entitled to remedies this court may find suitable after trial of the matter.

**Defendants' Monopolistic Acts**

277.    In 2005, BoxRec applied to become recognized as the official record keepers for the Association of Boxing Commissions (ABC). The ABC held interviews with both Fight Fax and BoxRec at their 2005 convention.

278.    Each applicant made a submission and presentation to the ABC panel which included state commissioners and attorneys. The panel then voted unanimously in favor to award Fight Fax the position.

279.    The ABC later revealed that they had undertaken tests to measure the accuracy of the records of the websites and the Fight Fax records were shown to be 100% accurate with BoxRec's was found "to be substantially lower".

280.    In 2016, the ABC voted to recognize BoxRec as an official record keeper alongside Fight Fax.

281.    On information and belief, in 2018, BoxRec became the official record keeper of Boxing and the ABC, despite its lower accuracy and Fight Fax's long-time position as record keeper.

282.    The selection of BoxRec effectively put FightFax out of business and squeezed out other aspiring boxing registers, record keepers and registries despite BoxRec's

documented inferiority to FightFax and others.

283. As boxing promoter J. Russell Peltz stated "very few things in life are one hundred percent. But I've come across some glaring errors at BoxRec, mostly in the historical records."

284. ESPN's Dan Rafael noted that "so many people have a hand in BoxRec that the records aren't always accurate. Ricardo Mayorga's record has been wrong for years. There's a mistake on Derrick Gainer's record too." Hauser, Thomas (21 July 2008). "Boxrec.com: Boxing's Indispensable Website". *SecondsOut.com*.

285. On belief and information, the ABC's selection of BoxRec was pushed over the objection of good government proponents, including former presidents of the ABC.

286. The ABC's selection and elevation of BoxRec gives it incredible power, which unfortunately, BoxRec has not used judiciously.

287. Rather than limit itself to the role of recordkeeper that would records that are submitted by boxing commission and other reliable sources, BoxRec appointed itself a super-commission that had the final say on what is acceptable or not acceptable to be included in its records.

288. Further, BoxRec, arbitrarily and many cases capricious would include events results in places with no commission (Saudi Arabia) as well as for promoters with no history or track records that have not been approved by any ABC member.

289. BoxRec does this despite its official position that it only accepts results from ABC members.

290. BoxRec's position that only results from ABC members should be included in its database is monopolistic as is forces commission and other entities that otherwise

would not have considered ABC member to join, solely because their commission results otherwise would not be accepted.

291.   On belief and information African and Asian countries, which struggles to pay ABC dues, otherwise would not have joined the ABC without BoxRec twisting their arms and refusing to report their results unless they join the ABC.

292.   BoxRec furthered the ABC's position as a monopoly in return for the monopolistic position the ABC granted it, and with each passing year, each of them became more powerful and monopolistic.

293.   The ABC has grown from an association of American, Indian, and Canadian commissioners to a must join association with associate members worldwide.

294.   Similarly, BoxRec has evolved from a sleepy website used mostly by boxing enthusiast and fighters to a must use registry.

295.   Most Fighters do not consider an event professional or legal if it is not listed on BoxRec.

296.   BoxRec, in part perpetuate this by referring to events it does not approve for inclusion as unsanctioned even when legally sanctioned by the legal authority entitled to sanction an event in the pertinent jurisdiction as was the case with the Event. The Event was called unsanctioned by BoxRec even though the UAEBF approved and sanctioned it with issuance of a formal NOC as well as by serving as the supervisor of the event and providing officials for same.

297.   The monopolistic action of BoxRec and the ABC affect interstate commerce and have caused harm to the Plaintiffs.

**Contradiction to ABC's Mission Statement**

298.   The ABC claims that it protects consumers by regulating the Boxing Industry through policies that promote the health, safety, and general welfare of the public in matters relating to Boxing.

299.   BoxRec is supposed to accomplish its mission by:

    a.   Ensuring that construction is performed in a safe, competent, and professional manner.

    b.   Licensing Promoters, Managers, fighters, and other Boxing professionals, and by enforcing licensing laws.

    c.   Requiring that any person providing services in Boxing or otherwise professionally involved in boxing to be licensed.

    d.   Enforcing the laws, regulations, and standards governing Boxing contracting in a fair and uniform manner.

    e.   Providing resolution to disputes that arise from Boxing activities; and

    f.   Educating Boxers and the public so that they make informed choices.

300.   Instead of balancing the regulation of Boxing and the interests of Public versus the interest of the ABC faction that favored BOXREC, the ABC turned BoxRec into a monster with absolute power and with no oversight by the ABC or any other entity, governmental or otherwise.

301.   BoxRec is able to bend the rules for promoters and individuals it or its owners favor while suppressing promoters in its favor or that are otherwise target by powerful competitors, such as was the case with Mendy.

302.   BoxRec all too often mistreats Promoters and Managers all under the guise of protecting consumers or otherwise acting in furtherance of its Contract with ABC, a

copy of which contract neither BoxRec nor the ABC would produce the contract despite numerous requests by Plaintiffs.

303.   It is all too easy for a Promoter or Manager in the Boxing business to get crosswise with BoxRec and be banned by it for no apparent objective reason.

304.   It is also too easy for BoxRec to be manipulated in favor of some promoters and not in favor of other promoters.

305.   Many promoters are seriously uninformed about BOXREC's enforcement powers, and do not understand the web of administrative process in which they can become ensnared as a consequence of BoxRec's elevation.

306.   Appealing to BoxRec or otherwise trying to figure out its requirements, even when a Promoter wishes to placate it, all too often is expensive and can take much time to fully resolve, provided BoxRec had the intention to have same resolved.

307.   To better understand the arbitrary actions of the BOXREC and its employees in dealing, all one has to do is look as what happed with the Event and UAEBF's efforts to be recognized as a reporting commission by BoxRec.

308.   Compounding matters is the fact that BoxRec's actions were, in whole or part, motivated by the involvement of powerful competitor of Plaintiffs, namely MTK, DBC, Round 10 and Seddiqi.

**BoxRec Powers are Gestapo-Like**

309.   BoxRec, acting under color of state law, as a result of the authority supposed given to it by the ABC, acts like a Gestapo and routinely violates Promoters' and fighter civil rights without any repercussion to it and without any recourse for the Promoters or fighters, including plaintiffs.

310.   "The basic Gestapo law passed by the government in 1936 gave the Gestapo *carte blanche* to operate without <u>judicial review</u>—in effect, putting it above the law. The Gestapo was specifically exempted from responsibility to administrative courts, where citizens normally could sue the state to conform to laws." See Wikipedia: http://en.wikipedia.org/wiki/Gestapo.

311.   Here we are in twenty first century and BoxRec acts like the Gestapo and has been acting in the same manner for years.

312.   BoxRec, on belief and information, creates its own rules, laws, and regulations, none of which are subjected to judicial review. In effect, putting it above the law.

313.   The difference between the Gestapo and BoxRec is that there is no law that specifically gives BoxRec carte blanche. It is worse than that BoxRec choses to enact these unlawful requirements on their own. No authorization by the legislature, nothing put to a public vote.

314.   BoxRec, just make its rules as the managers and owners wish, and without having to answer to no one, not even the ABC.

315.   The President of the ABC, in response to a letter from Plaintiff Muniz, said as much. He said that the ABC had no power to regulate BoxRec. Apparently, the ABC's contract with BoxRec gave BoxRec various rights and powers but reserved to ABC exercised no right to oversee BoxRec.

316.   Clearly, BoxRec, by its actions has lost sight of its mission as a boxing register— the protection of consumers and the recording of boxing events.

317.   Neither the ABC nor its members have challenged BoxRec on its arbitrary exercise of its powers and the exclusion of legitimate results.

318.   BoxRec, on belief and information, is not randomly selecting promoters to give a challenging time. Instead, in some instances, BoxRec is specifically profiling and targeting Promoters for nefarious reasons as was the case here.

319.   With "critical classifications" and other arbitrary clarification, BoxRec can depend on the whim of a single power hungry BoxRec employee to profile specific individuals, and Promoters.

320.   Further, BoxRec, can rely of the whim of its officers and owners Sheppard and M.Sheppard to zero in on any individual or company and may do so with less than noble motive, as was the case with the Event and the targeting of Plaintiff Mendy.

321.   The actions outlined hereinabove are provide many of the examples of BoxRec's use Gestapo tactics to operate without transparency and not within the law.

322.   BoxRec actions against Plaintiffs, on belief and information, are nothing more than an extension of its Gestapo actions to Plaintiffs.

323.   Other promoters are also the subject or BoxRec's arbitrariness.

324.   Recently, BoxRec even went to the extent of giving WABA notice that it would not accept its title results as a sanctioning agency since there are simply too many sanctioning organizing. By what right BoxRec could unilaterally and without any legislation or enabling resolution from the ABC decide on which sanctioning bodies to accept and which not to accept still behooves Plaintiff Mendy.

325.   Beginning in December 2020 and continuing to the Present, several BoxRec employees, with or without John Sheppard's and Marina Sheppard's consent, engaged in a pattern of behavior that not only resulted in BoxRec's breach of the Plaintiffs' rights but also amounted to a violation of the Sherman Act and/or other antitrust laws,

as well as the violation of various state laws, law and equity as will be proven at trial.

**Anticompetitive Effects**

326.    ABC and BoxRec has maintained unlawful monopolies in the general listing and registration of Boxing events, and general registration of Boxing information and the Boxing markets through their many exclusionary agreements and other conduct that have separately and collectively harmed competition by:

    a.    Substantially foreclosing competition in the Boxing registry and recordkeeping business and protecting BoxRec from any meaningful competition by making it the Official Recordkeeping of the ABC and Boxing.

    b.    Eliminating competition for BoxRec by making it official record keeper without allowing competitive bids or otherwise awarding the BoxRec an exclusive contract to the exclusion of all other boxing registries without an open and transparent bidding process.

    c.    Excluding general record keeping services rivals from effectively getting access to official results and other data provided by the ABC and its member commissions, thereby denying BoxRec rivals the necessary information and scale needed to compete effectively with BoxRec in providing recordkeeping services.

    d.    Increasing barriers to entry and excluding competition at emerging boxing registry services from nascent competitors.

    e.    Stunting innovation in new products that could serve as alternative boxing results registry or disruptors to the traditional ABC and BoxRec recordkeeping model; and

    f.   Insulating ABC and BoxRec from significant competitive pressure to improve their record keeping processes and BoxRec's monopoly as official registry and provider of boxing recordkeeping services.

327.   In return for the special and monopolistic position that the ABC was able to put BoxRec in, BoxRec reciprocated by professing and implementing a policy that precluded all results from commissions and other entities that are not members of the ABC, even such results are from reliable sources.

328.   Further, BoxRec has used its relationship with the ABC to twist the arms of promoters and boxing commissions worldwide, by implementing arbitrary exclusionary practices and demanding requirements that vary as it sees fit.

329.   As a result, boxing commissions and professional organization involved with Boxing are forced to become members of the ABC or risk not having their events, fights and fighters registered with BoxRec unless otherwise favored by BoxRec using one of its many arbitrary exceptions to the stated official rule that only ABC member results should be reported in BoxRec.

330.   By restricting competition in the recording of fights and limiting the BoxRec fight registry to only fights that are reported by ABC member commissions, ABC and BoxRec's conduct has harmed consumers by impeding the comprehensiveness of boxing record and otherwise reducing the quality of boxing data accessible to fighters, promoters, matchmakers and other boxing professionals (including dimensions such as suspensions, health records, and other useful boxing data), lessening choice in Boxing, and impeding innovation.

331.   ABC and BoxRec's exclusionary conduct also substantially foreclose competition

in both the recording of boxing events and other registry of other pertinent as well as the options available to boxing regulators and commissions, limiting choice and harming boxing professional and the public by limiting choice.

332.    By suppressing competition, ABC and BoxRec has given more power to manipulate its data registry and boxing record while the ABC has seen its membership mushroom  as regulators and boxing organizations everywhere now must consider ABC membership in order to have any guarantee that their results would be included in BoxRec.

333.    This suppression of competition in turn grants BoxRec more power to play God when it comes to inclusion of boxing data in the BoxRec registry, allowing both BoxRec and the ABC the ability to exert more influence in boxing than they otherwise would have in a competitive market.

334.    As a result of their monopolies, ABC and BoxRec can reduce the quality of the services they provide the public and consumers, including by restricting the information included in the registry as well as charging more to advertisers for listing (manager and promoter listings) and other advertisement or by increasing ABC membership fees, ABC convention fees as well as ABC charges for other services.

335.    ABC and BoxRec's conduct also has harmed competition by impeding the development and distribution of innovative apps that offer registry features that would otherwise challenge ABC and BoxRec.

336.    ABC and BoxRec has also harmed competition by raising rivals' costs and foreclosing them from effective boxing results channels, such as the results of ABC members, preventing them from having enough data to meaningfully challenge ABC

and BoxRec's monopoly in Boxing.

337.    ABC and BoxRec's monopoly in Boxing also have given BoxRec extraordinary power as the gateway to the official boxing record, which it uses to promote its own web content and increase its profits.

338.    ABC and BoxRec's arrangement have demoted the recording keeping ability of FightFax and other boxing registries, pushing these to near irrelevance.

339.    This raises their costs (as they must spend more time and money to acquire boxing results and other data), reduces their competitiveness, and limits their incentive and ability to invest in innovations that could be attractive to users.

340.    Absent ABC and BoxRec's exclusionary agreements and other conduct, dynamic competition for box registries would have led to higher quality recordkeeping, increased consumer choice, and a more beneficial user experience.

341.    In addition, more competitive recordkeeping in the markets would allow advertisers to purchase ads at more attractive terms, with better quality and service.

342.    Finally, the incentives and abilities for companies to develop and distribute innovative recordkeeping sites and other products would be restored, resulting in more options, better products, and higher consumer welfare overall.

343.    The anticompetitive effects flowing from ABC and BoxRec's agreements, particularly when considered collectively, have allowed ABC and BoxRec to develop and maintain monopolies in the markets for Boxing as a boxing registry in the case of BoxRec and as trade association in the case of ABC.

344.    These anticompetitive effects outweigh any benefits from those agreements, or those benefits could be accomplished by less restrictive means.

**Specific Antitrust Allegations.**

345.    Boxing, Boxing recordkeeping and registry services in the United States constitutes

a relevant antitrust market and ABC and BoxRec has monopoly power in that market.

346.    ABC and BoxRec have willfully maintained and abused their monopoly power in

Boxing through anticompetitive and exclusionary agreements that lock up their

positions in Boxing, enabling BoxRec to serve as official recordkeeper of the ABC and

by extension all of Boxing and become the predominant boxing registry for Boxing and

maintaining the top position in the searches of boxing professional whether on

browsers, mobile devices, computers, and other devices.

347.    Further, this arrangement has worked to ABC's advantage enabling it to otherwise

recruit and onboard members it otherwise would not have had.

348.    The exclusive agreement between the ABC and BoxRec is at the expense of boxing

registry rivals such as Fight Fax.

349.    This exclusive agreement is also at the expenses of promoters, managers, fighters

and other boxing professionals such as Plaintiffs as BoxRec is placed in a position of

absolute power to decide whose results it should accept in its database as opposed to

being a record keeper that simply includes records that can be verified as accurate

regardless of the membership of the provider in the ABC or whether the provider is

otherwise in BoxRec's good graces or has not crossed a BoxRec employee, Manager,

Owner, affiliate or co-Conspirator as was the case in of the Events and Plaintiffs.

350.    ABC and BoxRec's exclusionary conduct have foreclosed a substantial share of the

boxing registry market and enabled BoxRec to acquire a larger share of Boxing records

search and the ABC to increase its membership.

351.    ABC and BoxRec's anticompetitive acts have had harmful effects on competition and consumers.

352.    The anticompetitive effects of ABC and BoxRec's exclusionary agreements outweigh any pro-competitive benefits in the boxing market or can be achieved through less restrictive means.

353.    ABC and BoxRec's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

354.    ABC and BoxRec's anticompetitive and exclusionary practices have caused the d Plaintiffs harm.

355.    As a result of ABC and BoxRec's anticompetitive and exclusionary practices and the harm it has caused, Plaintiffs are entitled to damages in an amount currently unascertainable but on belief and information is in excess of $1,000,000.00.

356.    Further, the Plaintiffs are entitled to cost of this litigation as well as attorney fees, when hired or quantum meruit if no attorneys are hired.

357.    The Plaintiffs are also entitled to remedies this court may find suitable after trial of the matter.

**FOURTH CLAIM FOR RELIEF: MAINTAINING A MONOPOLY IN BOXING REPORTING IN VIOLATION OF SHERMAN ACT § 2**

358.    Plaintiffs incorporate the allegations of paragraphs 1 through 358 above.

359.    Boxing Reporting in the United States is an integral part of the Boxing Acts and a relevant antitrust market.

360.    ABC and BoxRec has monopoly power in that market.

361.    On belief and information, at least as professed by Sheppard and ABC's officials, the ABC and BoxRec entered into an agreement that provides BoxRec would only

report fight results by member organizations of the ABC or that are otherwise approved by BoxRec and/or the ABC.

362.     In so doing, BoxRec and the ABC that have willfully maintained and abused their monopoly power in the reporting of fight results and other relevant data pertinent to the maintenance of an accurate record of Boxing activities, and they did this through anticompetitive and exclusionary agreements that lock up their positions in the Boxing Industry as leading boxing registry (BoxRec) and Membership Associations (ABC).

363.     Promoters wishing to have their results in BoxRec have to use supervision by an ABC approved commission per BoxRec.

364.     Commissions wishing to be direct reporting commissions of BoxRec have to be members of ABC, also per BoxRec.

365.     The artificial restrictions placed benefit ABC and BoxRec at the expense of their rivals. ABC's membership and power are bolstered while BoxRec power continues to expand.

366.     ABC and BoxRec's exclusionary conduct have foreclosed a substantial share of the both the boxing registry market as well as the results of entities that are not members of the ABC.

367.     ABC and BoxRec's anticompetitive acts have had harmful effects on competition, advertisers, boxing professionals (including promoters, managers, fighters, and other professionals such as the Plaintiff) and consumers.

368.     The anticompetitive effects of ABC and BoxRec's agreements outweigh any procompetitive benefits in this market or can be achieved through less restrictive means.

369.   ABC and BoxRec's anticompetitive and exclusionary practices violate Section 2 of

the Sherman Act, 15 U.S.C. § 2.

**FIFTH CLAIM FOR RELIEF: CONSPIRING TO MAINTAIN A MONOPOLY IN BOXING AND RECORD KEEPING TO THE DETRIMENT OF PLAINTIFFS IN VIOLATION OF SHERMAN ACT § 2**

370.   Plaintiffs incorporate the allegations of paragraphs 1 through 369 above.

371.   Boxing and the reporting of accurate results in the United States are part of a

relevant antitrust market, and ABC and BoxRec has monopoly power in that market.

372.   ABC and BoxRec have willfully maintained and abused their monopoly power by

conspiring with each other and with Sheppard, M.Sheppard, Lu, Seddiqi, Mohan,

Round 10, DBC, MTK, Kinahan and Does 1 through 20 to keep out the results of events

that Promoter Mendy has an interest as well as the interest of promoters and

commissions that are not favored.

373.   This conspiracy was to benefit Round 10, DBC, MTK, Seddiqi, Mohan, and Does

1 through 20 and at the expense of their promoter rivals, including Plaintiff Mendy and

his extant partners in the Event.

374.   The action of each conspirator should be imputed to the other as if done by each of

them.

375.   ABC and BoxRec's exclusionary conduct and the actions of those acting in concert

with them foreclosed the inclusion of the results of various events and resulted in a

smear campaign against Plaintiff Mendy, Muniz, and their associates.

376.   By the losses suffered by Plaintiff Mendy, the absence of wins on the record of

fighters, the absence of a title on the record of Habazin, the placement of Habazin and

others to inactive status, and the difficulty Plaintiff Mendy now experiences in

recruiting fighters or otherwise fighting the smears spread by the ABC and/or BoxRec, and their co-conspirators, it is clear that the anticompetitive acts related to this conspiracy have had harmful effects on competition, Boxing Professionals such as Plaintiffs, and consumers.

377.   The anticompetitive effects of ABC and BoxRec's conspiracy to violate the Sherman Act and to keep out the results of the Event and otherwise to suppress Plaintiff Mendy, the other plaintiffs and other non-parties outweigh any procompetitive benefits in this market or can be achieved through less restrictive means.

378.   ABC and BoxRec's conspiracy and related anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

379.   ABC and BoxRec's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

380.   ABC and BoxRec's anticompetitive and exclusionary practices have caused the Plaintiffs harm.

381.   As a result of ABC and BoxRec's anticompetitive and exclusionary practices and the harm it has caused, Plaintiffs are entitled to damages in an amount currently unascertainable but on belief and information is in excess of $1,000,000.00.

382.   Further, the Plaintiffs are entitled to cost of this litigation as well as attorney fees, when hired or quantum meruit if no attorneys are hired.

383.   The Plaintiffs are also entitled to remedies this court may find suitable after trial of the matter.

## SIXTH CLAIM FOR RELIEF: REQUEST FOR ANTITRUST RELIEF
## (Against ABC and BoxRec Only)

384.   To remedy these illegal acts in violation of the Sherman Act, Plaintiffs request that

the Court:

a.  Adjudge and decree that ABC and BoxRec acted unlawfully to award BoxRec the sole position of official recordkeeper of the ABC and boxing in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

b.  Adjudge and decree that ABC and BoxRec acted unlawfully to make BoxRec the sole boxing register under the Boxing Acts (the Professional Boxing Safety Act and the Muhammad Ali Act) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

c.  Enter structural relief as needed to cure any anticompetitive harm.

d.  Enjoin ABC and BoxRec from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose and effect as the challenged practices.

e.  Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by ABC and BoxRec's unlawful conduct.

f.  Enter any additional relief the Court finds just and proper; and

g.  Award each Plaintiffs an amount equal to its costs incurred in bringing this action on his/her behalf.

**SEVENTH CLAIM FOR RELIEF:  LIBEL AND SLANDER**
**(Against BoxRec, Sheppard, M.Sheppard, Lu, Seddiqi, Round 10, DBC, MTK, Kinahan, Does 1 through 20)**

385.  Plaintiffs hereby incorporate by reference all the paragraphs of all prior allegations as though fully set forth herein.

386. Plaintiffs are informed and believe, and thereon allege that during and at all times relevant herein, Defendants BOXREC, Sheppard, M.Sheppard, Lu, Round 10, DBC, Seddiqi, Mohan, MTK, Kinahan and Does 1 to Does 10 uttered and published false and defamatory statements concerning Plaintiffs, which were reasonably understood by those who hearing same as referring to Plaintiffs Mendy and the Habazin.

387. Among other things, Defendants falsely represented that Plaintiff Mendy's Promotion license was subject to discipline and that Mendy was barred from promoting in United States when he was not.

388. Defendants also falsely represented that Mendy was not a professional boxing promoter, did not pay fighters, does not promote competitive fights, and otherwise engages in the unprofessional acts as has been outlined hereinabove and that such misconduct was the basis for refusing to include the results of the Event in BoxRec.

389. Defendants also falsely represented that Plaintiff Mendy was incompetent and in breach of contractual obligations to boxers by not paying them or otherwise engaging in other unethical acts.

390. Plaintiff Mendy informed and believe, and thereon allege that this and similar false and defamatory statements were made by Defendants with the intent of conveying the false and defamatory idea that Plaintiffs were delinquent in their contractual obligations, persons who could not be trusted to perform their obligations, persons who breached their obligations to fighters, and propagating a deliberate falsehood when they represented that Plaintiffs were not in compliance with boxing rules and regulations.

391. The words uttered by Defendants were slanderous *per se* because they made false statements regarding Plaintiffs' reputation, and by innuendo by impliedly accused

Plaintiffs of lying, committing the crime of fraud, lying, breaching their agreements and other immoral acts.

392.   The words were understood by those who heard them in a way which defamed Plaintiffs because the words were intended to slander Plaintiffs' reputation in an attempt to make the public to believe that Plaintiffs' words cannot be relied on as Plaintiffs were unsavory characters.

393.   Defendants caused Plaintiffs to suffer substantial damages as set forth herein.

394.   As a direct proximate result of the above-described words, Plaintiffs have suffered damages.

395.   Plaintiffs have suffered loss of their reputation, shame, mortification, emotional distress, and injury to their feelings, while suffering and continuing to suffer general and special damages as set forth herein.

396.   The above-described words were spoken by Defendants because of their feelings of hatred and ill will toward the Plaintiffs and with a desire to oppress and silence Plaintiffs, as well as suppress the results of the Event and Plaintiff Mendy's ability to host events in the UAE and thus entitling Plaintiffs to an award of exemplary and punitive damages in an amount according to law.

397.   As more fully set forth above, Defendants made defamatory statements about Plaintiffs which were untrue, and disparaged, and therefore damaged the reputation of Plaintiffs and caused them other damages. The defamatory language was clear and reasonably capable of only one meaning. The defamatory language was for no purpose other than to injure Defendants' reputation, expose them to public hatred, contempt, or ridicule, impeach their honesty, integrity, virtue, or reputation and to cause them harm.

398.    In reaction to the defamatory statements by Defendants, and the individual
Plaintiffs have been emotionally devastated and suffered anxiety, worry, sleeplessness
and other physical manifestations of emotional distress.

399.    Defendants' statements were not privileged in any way.

400.    As a direct and proximate result of Defendants' defamatory statements, Plaintiffs
have been damaged and such damages were proximately caused by Defendants' libel.

401.    Further, Defendants' malicious and intentional acts against Plaintiffs impose
liability for punitive damages as they were performed with malice and with knowledge
of the actual truth.

402.    As a direct and proximate result of Defendants' acts, and the conduct alleged above,
Plaintiffs have suffered, and continues to suffer general and special damages in an
amount to be determined according to proof at time of trial, which Plaintiffs are
informed, believe, and thereon alleges is in excess of the sum of $1,000,000.00.

403.    As a further direct and proximate result of Defendants, and each of their conduct
alleged above, Plaintiffs are required to expend their time and energy to gather facts,
seeking and conferring with legal counsel, and filing a legal action to redress said
Defendants' conduct, all to Plaintiffs' detriment in a sum to be proved at the time of
trial.

404.    As a direct and proximate result of the conduct of Defendants, Plaintiffs may be
required to retain legal counsel and incur legal costs and reasonable attorneys' fees, all
to Plaintiffs' detriment, in a sum to be proved at the time of trial.

405.    As a proximate result of the negligence of Defendants, and the Defendants'
defamation of Plaintiffs, Plaintiffs have suffered loss of their reputation, shame,

mortification, emotional distress, and injury to his feelings, in a sum according to proof at the time of trial.

406.    In doing the acts herein alleged, Defendants has acted with fraud, malice, and oppression, entitling Plaintiffs to punitive damages in an amount according to law.

**EIGHTH CLAIM FOR RELIEF:  TORTIOUS CONDUCT**
**(Against All Defendants)**

407.    Plaintiffs hereby incorporate by reference all paragraphs of the allegations of all prior Causes of Action, as though fully set forth herein.

408.    Defendants, and each of them, had a duty of due care to Plaintiff, as set forth herein.

409.    In committing the acts herein alleged, the aforesaid Defendants, and each of them did so negligently, carelessly, and recklessly perform their duties, and should have known that Defendants would breach their fiduciary duties to Plaintiffs.

410.    On belief and information, this conduct is intentionally done for Defendants' benefit .

411.    On belief and information all of these intentional acts and the other intentional acts, whether acts discrimination, breach of duty of good faith and fair dealing, breach of fiduciary duties, and/or other intentional acts of defendants that cause plaintiffs harm, are tortious conduct.

412.    As a direct and proximate result of Defendants tortious acts, and each of their conduct alleged above, Plaintiffs have suffered, and continue to suffer general and special damages in an amount to be determined according to proof at time of trial, which Plaintiffs are informed and believe and thereon allege is in excess of the sum of $1,000,000.00.

413.   As a further direct and proximate result of Defendants, and each of their conduct alleged above, Plaintiffs were required to expend their time and energy to gather facts, seeking and conferring with legal counsel, and filing a legal action to redress said Defendants' Breach of Fiduciary Duty, all to Plaintiffs' detriment in a sum to be proved at the time of trial.

414.   As a direct and proximate result of the tortious conduct of Defendants, Plaintiffs may be required to retain legal counsel and incur legal costs and reasonable attorneys' fees, all to Plaintiffs' detriment, in a sum to be proved at the time of trial.

415.   As a proximate result of the tortious conduct of Defendants, and the Defendants' Breach of Fiduciary Duty, Plaintiff Habazin suffered loss of reputation, shame, mortification, emotional distress, and injury to her feelings, in a sum according to proof at the time of trial.

416.   In doing the acts herein alleged, Defendants acted with bad intention, malice, and oppression, entitling Plaintiffs to punitive damages in an amount according to law.

**NINETH CLAIM FOR RELIEF:  UNFAIR BUSINESS PRACTICES**
**(Against BoxRec, MTK, Round 10, and DBC)**

417.   Plaintiffs adopt, allege, and affirm all allegations and averments contained in the above and forgoing paragraphs of this Complaint, especially the allegations contained in paragraphs 1through 172, as if fully restated herein.

418.   Defendants committed unfair competition and deceptive trade practices in violation of state and federal law which proximately caused harm and damage to Plaintiffs.

419.   As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

420.    Defendants' conduct was undertaken in bad faith, was malicious and manifested a wanton disregard of and reckless indifference toward the rights of Plaintiffs thereby entitling Plaintiffs to punitive or exemplary damages.

421.    The wrongful conduct alleged above constitutes unfair business practices in violation of Plaintiffs' rights under New Jersey and California law.

422.    Plaintiffs are entitled to all relief, including monetary relief against Defendants as may be authorized by law.

## TENTH CLAIM FOR RELIEF:  CIVIL CONSPIRACY
### (Against all Defendants)

423.    Plaintiffs adopt, allege, and affirm all allegations and averments contained in the above and forgoing paragraphs of this Complaint.

424.    Defendants  named and their associates conspired and continue to conspire with each other and others against Plaintiffs as alleged herein and above including, but not limited to depriving Plaintiffs of their civil rights, contractual rights, and other rights.

425.    As a result of Defendants' conduct, Plaintiffs suffered and continue to suffer general, special, actual, and compensatory damages, in an amount to be proven at trial for which all Defendants are jointly and severally liable.

## ELEVENTH CLAIM FOR RELIEF:  DISCRIMINATION
### (Against ABC and BoxRec)

426.    Plaintiffs adopt, allege, and affirm all allegations and averments contained in the above and forgoing paragraphs of this Complaint.

427.    The actions of Defendants herein constitute discrimination.

428.    Mendy is black and of African origin.

429.    Dene also is black and of African origin.

430.    There is no other explanation for several of the Entity Defendants' action other than race and national origin discrimination.

431.    For example, the ABC's own guidelines mandate the reporting of results for all fighters except Africans.

432.    On belief and information, the African continent have more unreported events in BoxRec's registry than any other continent on information and belief.

433.    Further, on information and belief, the conditions for reporting imposed by BoxRec and condoned by the ABC, are not uniform and are more restrictive for African countries such as Zimbabwe than for any other region.

434.    On a micro level, on information and belief, the requirements for events in sub-Sub Saharan (majority Black) countries are even more stringent even when comparing African continent results.

435.    Defendants' actions have caused Plaintiffs Mendy and Denes harm.

436.    As a result of Defendants' conduct, Plaintiffs Mendy and Denes suffered and continue to suffer general, special, actual, and compensatory damages, in an amount to be proven at trial for which the Entity Defendants are jointly and severally liable.

**TWELVETH CLAIM FOR RELIEF:  CIVIL RICO**
**(Against all Defendants)**

437.    Plaintiffs adopt, allege, and affirm all allegations and averments contained in the above and forgoing paragraphs of this Complaint.

**RICO Overview**

438.    This complex civil action for RICO remedies is authorized by the federal statutes at 18 U.S.C. 1961 *et seq.*; for declaratory and injunctive relief; for actual, consequential and exemplary damages;  and for all other relief which this honorable

Court deems just and proper under all circumstances pleaded above, all of which have occasioned this Initial Complaint. See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO").

439. The root cause of this action is BoxRec's refusal to list the April 10, 2021 Event and to record its results at the command of a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, a conspiracy to suppress Plaintiff Mendy and his company Lion Heart Boxing Productions as well as events he and his fighters are involved in, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years.

440. The predicate acts alleged here cluster around not only the criminal acts of MTK Global and Kinahan, but also the criminal acts of ABC and various of its officers and directors.

441. Other RICO predicate acts, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.,* money laundering, mail and wire fraud, and bank fraud. See 18 U.S.C. §§ 1341 and 1344, respectively.

442. The primary objective of the racketeering *enterprise* has been to punish Mendy and his Event partners for promoting the Event without the enterprise's approval and for disrespecting MTK local partner Ahmed Seddiqi by preventing the listing and recording of the Event, inflicting severe and sustained economic hardship upon Plaintiffs, impairing, obstructing, preventing and discouraging Plaintiff Mendy from promoting events within and outside the UAE, and otherwise being involved in boxing.

443.    On belief and information, the partial list of acts and events now documented in herein constitutes probable cause for granting all relief requested *infra* in the instant COMPLAINT.

444.    Moreover, further acts and events occurred after April 10, 2021 which also qualify as RICO predicate acts that constitute *further* probable causes for all the relief requested *infra*.

445.    For example, Plaintiffs herein allege that obstruction of justice did in fact occur *whenever* MTK Global, KOCG and Kinahan were involved in racketeering activity, *whenever* the conspirators acted against Plaintiffs, and/or *whenever* the Defendants violated the Boxing Acts.

446.    The actions of Defendants herein constitute Civil RICO

447.    Defendants' RICO actions have caused Plaintiffs harm.

448.    As a result of Defendants' RICO conduct, Plaintiffs have suffered and continue to suffer general, special, actual, and compensatory damages, in an amount to be proven at trial for which the Defendants are jointly and severally liable.

## RICO FACTUAL BACKGROUND

### Preliminary Statement

449.    This dispute arises from Defendant's (1) violation of the Racketeering Influenced and Corrupt Organization (RICO) Act 18 U.S.C. § 1962(a) – Acquiring an Interest in an Enterprise by Use of Income; (2) violation of RICO 18 U.S.C. §1962(b) – Acquiring or Maintaining an Interest in or Control of an Enterprise; (3) violation of RICO 18 U.S.C. § 1962(c) – Conducting the Affairs of an Enterprise;(4) violation of RICO 18 U.S.C. § 1962(d) – Conspiracy to Conduct the Affairs of an Enterprise.

450.    At the center of and the driver of the conspiracy is Mr. Daniel Kinahan, Mr. Kinahan's company MTK, and his UAE partner Ahmed Seddiqi, and their associates.

451.    MTK, a Dubai, UAE, and British based company, holds itself out as the "biggest force in business of boxing" in its capacity as a boxing management and promotional company.

452.    MTK was co-founded and is in part owned and controlled by Mr. Daniel Kinahan, a noted member of Ireland's notorious Kinahan Cartel, also known as the Kinahan Organized Crime Group ("KOCG") by law enforcement officials.

453.    Seddiqi is the founder and owner of Round 10 Boxing and the Dubai Boxing Commission.

454.    On April 10, 2021, Mendy and his associates Murd Hamed and Vladimir Burdun promoted a boxing event (the Event) that had plaintiffs Denes (as boxer), Habazin (as boxer) and Muniz (as manager of Habazin) as participants.

455.    The promotion of this Event without DBC sanctioning, without the 'blessing' and approval of Defendants Kinahan, MTK, Seddiqi, Round 10 and DBC, as well the supposed otherwise "insulting" and/or "disrespecting" of Defendants Kinahan, MTK, Seddiqi, Round 10 and DBC is the root cause of and the genesis of the creation of a conspiracy to exact revenge and/or teach a lesson to the Event's organizers, including Plaintiff Mendy.

456.    This perceived slight was unbeknownst the Plaintiffs. Plaintiffs only became aware of the problem and the suppression of the Event through the boxing rumor mill as well as the actions of Defendants, including Seddiqi, Mohan, DBC, MTK, Kinahan and various BoxRec actors, namely John Sheppard, Marina Sheppard, and Samson Lu.

457.    On belief and information, the lesson being thought to Plaintiffs is aimed at not only Mendy and his partners but also to everyone involved in Boxing, in the UAE and otherwise.

458.    In furtherance of the conspiracy, Kinahan called BoxRec and commanded it to suppress the entry of the Event and its results from BoxRec's database, the Boxing Register, in violation of the Boxing Acts.

459.    This call has not only resulted in the suppression of the entry of the results of Event but also caused an effective blackballing of Mendy as a promoter and a conspiracy to suppress the results of the other events he promoted or is known to be involved.

460.    All of the Plaintiffs have been harmed by the actions of the conspiracy.

461.    The conspiracy to suppress was entered into in violation of UAE law, United Kingdom law, federal law, and in complete disregard for the safety of boxers, the guidelines for boxing registers established by the ABC, and other tenets of the Boxing Acts.

462.    All attempts to resolve this matter with Defendants mostly have been met with outright hostility or simply have been ignored.

463.    RICO Defendant MTK Global Sports Management, LLC, is a Dubai, UAE business entity with license number 785135 and having its registered office at PO Box 454833, Al Barsha Post Office, Dubai, United Arab Emirates. MTK Global Sports Management, LTD, is a wholly owned subsidiary of MTK Global Sports Management, LLC operating out of the United Kingdom with its principal place of business at 20-22 Wenlock Road, London, United Kingdom, N1 7GU. MTK stands for "Mack the Knife." MTK recently changed its name to Global Promotion Management LTD in the

United Kingdom. However, MTK still is operating and doing business as "MTK Global." See https://mtkglobal.com/.

464.   On belief and information, Defendant MTK operates in part through many corporate entities and individuals, including VGC, LLP is a New York limited liability partnership with a principal place of business at 1515 7th St, No 106, Santa Monica, CA 90401- 2605. VGC, LLP also has a principal place of business at 396 Degraw Street, Suite 1, Brooklyn, New York 11231. On information and belief, Principals of VGC, LLP involved with MTK include Mr. James L. Greeley who resides in Los Angeles County, California, Mr. Alexander R. Safyan is a litigation partner residing in Los Angeles County, California and other members of VGC, LLP domiciled in either Napa County, California or Kings County, New York.

465.   On information and belief, Paul D. Gibson is MTK's Chief Strategy Officer and an individual residing in Alicante, Valencian Community, Spain is an integral part of MTK and its enterprise activities.

466.   Defendant Daniel Kinahan is a co-founder and on belief and information continues to own and control MTK. On belief and information, Kinahan not only is the founder of MTK, but he continues to control MTK indirectly, through proxies, despite publicly severing ties with it. As a result, Kinahan is at the matrix of the conspiracy.

467.   Defendant Round 10 Boxing also is Dubai, UAE business entity and has its registered office in Al Quoz, Dubai, United Arab Emirates, 364/8 Street, Al Quoz First, Capitol Warehouse 42, Dubai 128281. On belief and information, Round 10 Boxing was set up and is owned by Seddiqi and a partner.

468.    On belief and information Seddiqi also founded, owns and/or controls DBC, a boxing commission that has usurped the powers of the UAEBF and represents itself as the only entity authorized to regulate and sanction professional boxing events in Dubai. On belief and information, Defendant Seddiqi's ego and the fact that same was hurt by Plaintiff Mendy's event partner Murad Hamed is the origin of the conspiracy to punish Mendy and his associates.

469.    On belief and information, the conspiracy's actions against Defendants Denes, Habazin and Charles are effectively collateral damage, causing them suffering primarily because of their involvement with Mendy and Murad Hamed.

470.    Defendant Association of Boxing Commissions is a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania. The ABC was authorized by the Professional Boxing Safety Act (the Boxing Act), as amended by the Muhammad Ali Boxing Reform Act (the Muhammad Ali Act), to implement the recordkeeping and safety mandates of the said Acts (collectively the Boxing Acts). In furtherance of its mandate under the Boxing Acts, the ABC established guidelines for the selection and supervision of Boxing Registers under the Boxing Acts and purportedly selected BoxRec as the sole and exclusive Boxing Register under the purview of Boxing Acts.

471.    Defendants BoxRec was started by Defendants John Sheppard and at all times relevant is managed by him and his wife, Marina Sheppard. Both of the Sheppard Defendants are integral part of the RICO conspiracy herein.

472.    Defendant Samson Lu is the UAE representative of BoxRec and an integral part of the RICO conspiracy herein.

473.    Each and every Defendant was the agent, servant, employee, joint venture, partner, subsidiary, and/or co-conspirator of each other Defendant, and in performing or failing to perform the acts alleged herein each Defendant was acting individually as well as through and in the foregoing alleged capacity within the course and scope of such agency, employment, joint venture, partnership, subsidiary, and/or conspiracy.

474.    Violations of the Professional Boxing Safety Act of 1996 (PBSA or Boxing Act), as amended by the Muhammad Ali Boxing Reform Act of 2000 ("Muhammad Ali Act") carry with it civil and criminal penalties. See generally 15 U.S.C. § 6309.

**MTK, Mr. Kinahan, and the Conspiracy**

475.    MTK is a management and promotional company. MTK is part owned and operated by Mr. Daniel Kinahan who is a member of criminal organization known to law enforcement officials as the KOCG.

476.    On belief and information MTK and Mr. Kinahan do not possess a proper license or authority to perform either management or promotional services in the UAE or United States.

477.    MTK is not licensed in the UAE and the United States as a boxing manager or a boxing promoter. MTK, however, provides both manager services and promotion services in the UAE and the USA through proxies, which are prohibited under the Ali Act firewall provisions. See 15 U.S.C. § 6308.

478.    By way of example, on belief and information, MTK and Kinahan use Seddiqi, Round 10 and others to promote fights in Dubai and uses the VGC law firm to operate and perform boxing functions in the United States in violation of the Boxing Acts. See generally 15 U.S.C. §§ 6301-6313.

479.    On belief and information VGC, on behalf of MTK and at their direction, has conspired with others to serve as managers of fighters, to negotiate and secure a title defense for fighters with full knowledge and disregard for contractual obligations and without compliance with any of the laws or regulations, which provide the authority to do so and collectively remain subject to both criminal and civil consequences for these alleged violations.

**MTK and Organized Crime**

480.    MTK runs an operation out of the Dubai Economic Zone, as discussed below, and is overseen by Mr. Daniel Kinahan who also resides in Dubai, UAE.

481.    MTK was co-founded by Mr. Daniel Kinahan. Mr. Daniel Kinahan is known as the head of Kinahan Organized Crime Group ("KOCG") in Ireland. The KOCG is allegedly responsible for several murders, drug trafficking, and money laundering. The KOCG is one of Europe's biggest drug cartels. Law enforcement experts believe that Mr. Daniel Kinahan started MTK to launder ill-gotten gains from drug trafficking. Mr. Daniel Kinahan is wanted for question by several law enforcement agencies due to the murderous activities of the KOCG. On or about September 16, 2018, the United States Customs and Border Protection (CBP) banned Mr. Kinahan and roughly twenty-six other members of the KOCG from entering America due to narco-terrorism concerns. See    e.g.,    https://www.thetimes.co.uk/article/america-bans-the-kinahan-crime-familyr7bbbntll;    https://www.thesun.ie/news/5456085/cartel-boss-daniel-kinahanbanned-us-placed-on-list-narco-terrorists/.

482.    In 2016, Mr. Kinahan fled Ireland to Dubai, UAE after a boxing match he promoted ended in violence at the Regency Hotel in Dublin, Ireland. During that boxing match,

several masked shooters fired AK-47s into the crowd, killed one person, and injured several more. This shooting is alleged to be a plot to kill Mr. Kinahan by a rival crime family. See e.g., https://www.ringtv.com/603461- buzz-and-scrutiny-build-regarding-mtk-global-and-daniel-kinahan/.

483.    Mr. Daniel Kinahan is currently living in Dubai, UAE where he continues to arrange boxing matches and act in a management capacity to MTK. See e.g. https://www.insider.com/tyson-fury-splits-from-reputed-drugs-bossdaniel-kinahan-2020-6;    https://www.sportscasting.com/what-we-know-abouttyson-furys-advisor-daniel-kinahan-a-suspected-1-1-billion-drug-lord/.

484.    On belief and information, as already reduced to judgment, MTK, through VGC, interfered with Heredia Boxing Management's promotion contract with Golden Boy Promotions (GBP). VGC allegedly as Mr. Diaz's boxing manager by arranging the next fight between Mr. Diaz and a mandatory contender, Shavratdzhon Rakhimov with GBP. This fight just got scheduled for February 13, 2021 without input from or communication with Heredia Plaintiffs, actions directed and funded by MTK.

485.    On belief and information, MTK has been flooding and continues to flood the U.S. marketplace with illegal funds, not respecting US law through their interference with contract, violating the Boxing Acts firewall provisions, and not obtaining the required licensure. MTK has in the past signed numerous US boxers and several dozen across the globe in violation of the Boxing Acts.

486.    While MTK states it is a global management and promotion company, on belief and information both MTK and Kinahan also boxers sign management agreements using the title "advisory" in an unguarded attempt to avoid legal scrutiny without basis

in statutory law. However, in reality, MTK's agreements are management or promotion agreements based on the applicable definitions and MTK's and Kinahan's conduct.

487.     On belief and information and a predicate act, MTK provided financial inducement and advance of $100,000 as advance on Mr. Diaz's purse. This advance caused Mr. Diaz to Breach  his obligation to the Heredia Plaintiffs, a primary target of the Boxing Acts. *See* George Foreman Associates, Ltd. v. Foreman, 389 F.Supp 1308, 1314 (1974) ("The statutes and regulations indicate a clear purpose to safeguard boxers against the temptation to mortgage their futures in exchange for relatively meager present consideration.").

488.     On belief and information, MTK and Kinahan operate in the United States and this district through VGC and other proxies.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

489.     The Racketeering Influenced and Corrupt Organizations (RICO) Act allows for a wronged plaintiff to sue in civil court for damages. See 18 U.S.C. § 1964.

490.     At all relevant times MTK, Round 10, DBC and Seddiqi received or obtained money, either directly or indirectly from a pattern of racketeering activity. MTK is associated with Mr. Daniel Kinahan and the Kinahan Organized Crime Group ("KOCG"). The KOCG is an association-in-fact that operates one of Europe's largest drug trafficking and money laundering networks according to several law enforcement agencies. Mr. Kinahan co-founded MTK with Matthew "Mack The Knife" Macklin. Mr. Kinahan co-founded MTK in an attempt to launder illicit proceeds from drug trafficking through a seemingly lawful business. However, this attempt failed in 2016 when during a boxing match promoted by Mr. Kinahan ended in violence as a rival

crime family, believed to be the Hutch Family, began shooting the crowd. In the aftermath of that shooting and feeling the pressure from several law enforcement agencies, Mr. Kinahan fled from Ireland to Dubai, UAE and continued to operate MTK by creating the Dubai, UAE wing of MTK. In 2017, MTK made attempts on paper to sever the ties between MTK and Mr. Kinahan. However, recent reports—as recent as November 2020—still indicate that Mr. Kinahan is running MTK from Dubai, UAE. See e.g. https://www.belfasttelegraph.co.uk/news/northern-ireland/barry-mcguigan-inwarning-to-boxing-over-kinahan-grip-after-frampton-case-39750316.html.

491.    On belief and information, Seddiqi was natural partner for MTK and Kinahan because of his love for boxing as well as his family's established business as jewelry dealers and businessmen, which on makes it possible to funnel KOCG funds into the UAE.

492.    "Racketeering activity" is an act that violates certain statutes enumerated in 18 U.S.C. § 1961. An act of "racketeering activity" is also called a "predicate act." See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005). Drug trafficking and money laundering are both listed in 18 U.S.C. § 1961. Here, MTK received or obtained money, either directly or indirectly, from drug trafficking and money laundering through its association with Mr. Kinahan. Mr. Kinahan continues to arrange boxing matches that involve MTK fighters. These matches are steeped in money obtained from drug trafficking and money laundering. MTK then uses this money to attempt to bring in more fighters and arrange more fights so that more drug trafficking proceeds can be laundered through what appears to be a

legitimate business. MTK's thirst for new boxers supports the KOCG's money laundering needs to MTK to the UAE market and brought MTK to the US market.

493.    A "pattern of racketeering activity" means that a defendant, such as MTK, committed at least two distinct predicate acts. Distinct does not have to mean different types of predicate acts. A pattern of racketeering activity must include related predicate acts. Predicate acts are "related" to one another if they have the same or similar purposes, results, participants, victims, or methods. Here, MTK has approached several US fighters and offered similar "marketing advisor" arrangements. MTK sometimes does this with the knowledge and consent of the fighters boxing manager. On other occasions, such as this current dispute, it is a hostile attempt to peel a boxer or sport fighter away from his or her managers.

494.    For example, MTK holds Mr. Diaz out on its website as one of its boxers and has publicly tweeted about an upcoming mandatory-title defense bout. This bout was arranged between VGC and GBP, both of whom have not included Mr. Diaz's manager, Mr. M. Heredia and HBM in the conversation.

495.    A pattern of racketeering activity also requires predicate acts showing "continuity." Continuity can be demonstrated in two ways. The first is "close-ended" continuity where the related predicate acts extend over a substantial period of time. The second is "open-ended" continuity where the related predicate acts do not occur over a substantial period of time but are likely to be repeated in the future. Here, MTK continues to involve itself in drug trafficking and money laundering through its associate with Mr. Kinahan. These acts are likely to be repeated in the future. MTK advertises on its website that it is one of the biggest forces in boxing and is encouraging children as

young as fifteen to sign up with them to get more boxers in their grasps to continue the money laundering operation. This also includes a drive to become a dominant player in the United States as MTK continues its expansion into the United States.

496.    MTK has participated as a principal in the pattern of racketeering activity. MTK either committed or aided, abetted, counseled, commanded, induced, or procured the commission of several predicate acts that form a pattern of racketeering activity. MTK also willfully caused the commission of two or more alleged predicate acts that make up the pattern of racketeering activity. MTK committed these predicate acts with intent or knowledge. MTK knows that Mr. Kinahan is involved in drug trafficking and money laundering and yet MTK still associates with Mr. Kinahan and does business regularly with Mr. Kinahan. Further, MTK itself is engaged in predicate acts when it proved these illicit funds to VGC to file a lawsuit on behalf of Mr. Diaz and send threatening letters to GBP demanding they declare the 2017 promotion agreement canceled in a matter of hours.

497.    MTK uses the income or proceeds derived from the racketeering activity to acquire, maintain, or operate an enterprise. An "enterprise" may consist of an individual, partnership, corporation, association, or other legal entity. Here, MTK has attempted to acquire an interest in Mr. Joseph Diaz, as a professional boxer. MTK provided Mr. Diaz $100,000 in an attempt to fraudulently induce him without proper licensure, contractual, or lawful authority. These funds are directly or indirectly derived from racketeering activity as described above. MTK receives funds directly or indirectly from Mr. Kinahan which are derived from racketeering activity such as drug trafficking

and money laundering. MTK itself is laundering the illicit proceeds of the KOCG drug trafficking enterprise.

498.    MTK is engaged in interstate and foreign commence. They are a foreign business entity operating in the United States. MTK is using and abusing US law in an attempt to gain a foothold in a lucrative market to continue their money laundering operation.

499.    The acts of MTK have caused damage to Plaintiffs.

500.    MTK used racketeering income to injure Plaintiffs.

501.    To establish standing for a civil RICO claim, four factors must be satisfied: the Plaintiff must be (1) a "person" (2) who sustains injury (3) to his or her "business or property" (4) "by reason of" defendant's violation of 18 U.S.C. § 1962. Standing depends on injury from the "conduct constituting the violation," and each section of RICO has a different injury requirement. Injury under § 1962(a) must stem from the investment of racketeering income; injury under § 1962(b) must stem from the acquisition of an interest on or control over an enterprise; injury under § 1962(c) must stem from the predicate acts; and injury under § 1962(d) generally stems from the overt acts committed in furtherance of the conspiracy.

502.    Plaintiffs have standing under all four sections of RICO as they are considered a "person" who has sustained an injury to his business by reason of the injuries described below.

**ABC and BoxRec**

503.    Under Federal law, the term "boxer registry" means any entity certified by the Association of Boxing Commissions for the purposes of maintaining records and identification of boxers." See 15 U.S.C. § 6301.

504.    Violations of the Professional Boxing Safety Act of 1996 (PBSA), as amended by the Muhammad Ali Boxing Reform Act of 2000 ("Ali Act") carry with it civil and criminal penalties. See generally 15 U.S.C. § 6309.

505.    The purposes of the Boxing Acts are—**(1)** to improve and expand the system of safety precautions that protects the welfare of professional boxers; and **(2)** to assist State boxing commissions to provide proper oversight for the professional boxing industry in the United States.

506.    The Boxing Acts also prohibited conflict of interest as follows "No member or employee of a boxing commission, no person who administers or enforces State boxing laws, and no member of the Association of Boxing Commissions may belong to, contract with, or receive any compensation from, any person who sanctions, arranges, or promotes professional boxing matches or who otherwise has a financial interest in an active boxer currently registered with a boxer registry."

507.    The Act further prohibited the promotion of boxing events without ABC guidelines. It mandated as follows: "No person may arrange, promote, organize, produce, or fight in a professional boxing match held in a State that does not have a boxing commission unless the match is supervised by a boxing commission from another State and subject to the most recent version of the recommended regulatory guidelines certified and published by the Association of Boxing Commissions as well as any additional relevant professional boxing regulations and requirements of such other State.

508.    The ABC was tasked with the promulgation of guidelines and enforcement of the
safety provisions of the Boxing Acts, and on belief and information generally has done
a respectable job of same through its guidelines and member organizations.

509.    The ABC, however, has a dark side that involves corruption of members and the
organization itself.

510.    On belief and information, the ABC never fully complied with the transparency and
accountability rules and regulations required of non-profit organizations.

511.    For example, minutes of meeting are not religiously prepared or kept. Further, the
ABC's non-profit status application was not even made until well after the entity was
in operations.

512.    Further, the company has a history of shoddy and/or opaque bookkeeping that
enable various members of the ABC to skim money and/or otherwise steal from the
company without checks and balances to prevent same.

513.    The ABC established guidelines for the selection and supervision Boxing Registers.
However, without worthy cause, the ABC selected BoxRec as the sole Boxing Register.

514.    On belief and information, the selection may have been motived by corruption and
various conflicts of interests that involved extant ABC leadership at the time of award.
The selection of BoxRec as boxing register was clear surprise to both pundits and event
ABC board member.

515.    The actions of ABC board members and officers in running the ABC as their
personal fiefdoms, skimming money from it, selecting BoxRec as exclusive Boxing
Register to the exclusion of Fight Fax and others more qualified boxing registers,

constitute predicate acts and on belief and information otherwise qualify the ABC as an *enterprise* under the RICO Act.

**Acquisition and Maintenance of an Interest in and Control of an *Enterprise* Engaged in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(b)**

516.    Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein, with substance to prevail over form.

517.    All Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ <u>1961</u>(4), (5), (9), and <u>1962</u>(b).

518.    During the ten (10) calendar years preceding the date of filing, all Defendants did cooperate jointly and severally in the commission of two (2) or more RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ <u>1961</u>(1)(A) and (B), and did so in violation of the RICO law at <u>18 U.S.C. 1962</u>(b) (Prohibited activities).

519.    Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at <u>18 U.S.C. 1962</u>(b) *supra*.

520.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court though never codified in <u>Title 18</u> of the United States Code. See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

521.   Each of the Entity Defendants (ABC, BoxRec, Round 10, DBC and MTK Global) are responsible for the actions of their respective officers, employees and agents under the theory of *Respondeat superior* (principal is liable for agents' misconduct, knowledge of, participation in, and benefit from a RICO enterprise).

522.   Each of the defendants also is responsible for the action of the others are coconspirators as a result of their conspiracy

**COUNT TWO: Conduct and Participation in a RICO *Enterprise* through a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(c)**

523.   Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporate same by reference, as if all were set forth fully herein. Substance to prevail over form.

524.   Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

525.   Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

526.   During the ten (10) calendar years preceding the date of filing, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

527.   Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated

intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

528.    Each defendant is jointly and severally liable for the actions of its co-conspirators.

529.    Each defendant also liable for the actions of its officers, employees and agents under the theory of *Respondeat superior* (as explained above).

530.    **COUNT THREE:** Conspiracy to Engage in a *Pattern of Racketeering Activity*: 18 U.S.C. §§ 1961(5), 1962(d)

531.    Plaintiffs now re-allege each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein, praying that substance prevail over form.

532.    At various times and places partially enumerated above, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

533.    At various times and places partially enumerated above, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).    See also 18 U.S.C. §§ 1961(4), (5) and (9).

534.    During the ten (10) calendar years preceding filing, Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

535.    Plaintiffs further allege that Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to

threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

536.    Each defendant is jointly and severally liable for the actions of its co-conspirators.

537.    Each defendant also liable for the actions of its officers, employees and agents under the theory of *Respondeat superior* (as explained above).

**RELIEF REQUESTED**

538.    ***Wherefore***, pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiffs request judgment against all named Defendants as follows:

**ON COUNT ONE:**

a.    That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

b.    That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO *enterprise* of *persons*, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

c. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT ONE *supra.*

d. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

e. That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

f. That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

g. That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

h. That all Defendants pay to Plaintiffs the costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $150.00 per hour worked (a reasonable rate and a third of Mendy's standard professional rate if he were to be practicing as an attorney in the Commonwealth).

i.   That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of <u>18 U.S.C. 1962</u>(b) and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, His heirs and assigns.

j.   That Plaintiffs have such other and further relief as this Court deems just and proper, under the circumstances of this action.

539.   **ON COUNT TWO:**

a.   That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at <u>18 U.S.C. 1962</u>(c) (Prohibited activities).

b.   That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ <u>1961</u>(5) ("pattern" defined) and <u>1962</u>(c) *supra*.

c.   That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during      pendency      of      this      action, and *permanently* thereafter,      from      associating      with      any

RICO *enterprise* of *persons*, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

d.  That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

e.  That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT TWO *supra*.

f.  That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s).

g.  That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

h. That all Defendants pay to Plaintiffs treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

i. That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

j. That all Defendants pay to Plaintiffs the costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $150.00 per hour worked (a reasonable rate and a fraction of any professional rate for anyone competent enough to handle this action).

k. That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiffs, Plaintiffs' heirs and assigns.

l. That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

540. **ON COUNT THREE:**

a. That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or

conspired to acquire and maintain control of, a RICO *enterprise* engaged in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(b) and (d) *supra*.

b.  That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(c) and (d) *supra*.

c.  That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during        pendency        of        this        action, and *permanently* thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO *enterprise* that engages in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(b) and (d) *supra*.

d.  That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during        pendency        of        this        action, and *permanently* thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ <u>1961</u>(5), <u>1962</u>(c) and (d) *supra*.

e.  That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during        pendency        of        this        action,

and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in <u>COUNT THREE</u> *supra*.

f.   That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of <u>18 U.S.C. 1962</u>(d) *supra* and from all other violation(s) of applicable State and federal law(s).

g.   That judgment be entered for Plaintiffs and against all Defendants for Plaintiffs' actual damages, and for any gains, profits, or advantages attributable to all violations of <u>18 U.S.C. 1962</u>(d) *supra*, according to the best available proof.

h.   That all Defendants pay to Plaintiffs treble (triple) damages, under authority of <u>18 U.S.C. 1964</u>(c), for any gains, profits, or advantages attributable to all violations of <u>18 U.S.C. 1962</u>(d) *supra*, according to the best available proof.

i.   That all Defendants pay to Plaintiffs all damages sustained by Plaintiffs in consequence of Defendants' several violations of <u>18 U.S.C. 1962</u>(d) *supra*, according to the best available proof.

j.   That all Defendants pay to Plaintiffs the costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, as well as quantum meruit for work done by Plaintiffs themselves at a minimum of $150.00 per hour worked.

k.   That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of <u>18 U.S.C. 1962</u>(d) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust,

legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, His heirs and assigns.

l.    That Plaintiffs have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## REQUEST FOR JURY TRIAL

541.    Plaintiffs hereby request trial by jury.

**WHEREFORE,** Plaintiffs pray that Defendants be cited and served with a copy of this petition and that, after all legal delays and due proceedings are had, there be judgment rendered in favor of the Plaintiffs, and against Defendants, individually and jointly and severally.

Plaintiffs pray that Defendants be served with a copy of this petition and be duly cited to appear and answer same, and that after due proceeds had, there be judgment herein in favor of Plaintiffs, Edward Bissau Mendy, Brendon Denes, Ivana Habazin and Charles Muniz, and against Defendants, and their insurers, for damages that are reasonable in the premises, together with interest thereon from the date of judicial demand until paid, and for all costs of these proceedings.

PETITIONERS ALSO PRAY for all attorney's fees and court costs that can be afforded them by law, from the causes of action herein, and under state laws and the laws of the United States.

PETITIONERS ALSO PRAY for an award of *quantum meruit* for work done by them as *pro se* litigants before the hiring of legal counsel as can be afforded them by law, from the causes of action herein, and under state laws and the laws of the United States.

PETITIONERS FURTHER PRAY for all general and equitable relief that can be afforded them under state laws and Federal law.

PETITIONERS FINALLY PRAY for judicial interest from the date of demand.

RESPECTFULLY SUBMITTED

*Edward Mendy*

/s/ Edward Bissau Mendy

---

EDWARD BISSAU MENDY
4120 Erato Street, Apartment 1
New Orleans, LA 70125
504-339-4782
ebmendy@me.com


/s/ Ivan Habazin

---

IVANA HABAZIN
4120 Erato Street, Apartment 1
New Orleans, LA 70126
+385-98-974-5219
Cmuniz44@gmail.com


/s/Charles Muniz

---

CHARLES MUNIZ
4120 Erato Street, Apartment 1
New Orleans, LA 70126
561-507-6046
Mail3charlesm@gmail.com

*Brendon Denes*

/s/ Brendon Denes

---

BRENDON DENES
4120 Erato Street, Apartment 1
New Orleans, LA 70125
+263-77-762-5818
Lawrencedenee627@gmail.com


Dated:  April 10, 2022